# EXHIBIT 1

# Part 1

FILED
Gary Harrison
CLERK, SUPERIOR COURT

2/26/2021 2:18:34 PM

BY: ALAN WALKER /S/
DEPUTY

Case No. C20210938
HON. JEFFREY T. BERGIN

1

**Quarles & Brady LLP**
Firm State Bar No. 00443100
1 South Church Avenue, Suite 1800
Tucson, Arizona 85701
TELEPHONE 520.770.8700

2

3

Luis A. Ochoa (Bar #11027)
   Luis.Ochoa@quarles.com

4

5

Nicole L. Simmons (Bar #028947)
   Nicole.Simmons@quarles.com

6

*Attorneys for Plaintiff TMC HealthCare*

7

8

## IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA

9

## IN AND FOR THE COUNTY OF PIMA

10

11

TMC HEALTHCARE,

      Plaintiff(s),

12

13

vs.

14

CONTINENTAL CASUALTY
COMPANY,

15

      Defendant(s).

16

NO.

**COMPLAINT**

**JURY TRIAL DEMANDED**

17

18

      Plaintiff TMC HealthCare ("TMCH"), for its Complaint for a declaratory judgment

19

and damages against Defendant Continental Casualty Company ("Continental"), alleges as

follows:

20

### NATURE OF THE ACTION AND RELIEF SOUGHT

21

      1.      This action arises out of Continental's denial of coverage for TMCH's losses

22

arising from the SARS-CoV-2 virus (the "Coronavirus") and the disease that it causes,

23

Coronavirus Disease 2019 ("COVID-19") under the "all-risk" commercial property

24

insurance policy Continental sold to TMCH (the "Policy," attached hereto as Ex. 1).

25

Continental and/or its affiliate CNA, drafted the "all risk" Policy, which covers all "risks of

26

1     direct physical loss of or damage to property" at covered Locations "[e]xcept as hereafter
2     excluded."

3       2.      The Policy is written on a CNA Signature Property Policy (annexed hereto as
4     Exhibit 1).

5       3.      Virus, communicable disease and pandemics are not excluded causes of loss
6     under the Policy.

7       4.      Indeed, the Policy expressly includes Disease Contamination Coverage,
8     which provides that if an "evacuation or decontamination order" is issued "by the National
9     Center[s] for Disease Control ("CDC"), authorized public health official or governmental
10    authority because of the discovery or suspicion of a communicable disease or the threat of
11    the spread of a communicable disease" then Continental "will pay for" among other things
12    "the necessary and reasonable costs" to "decontaminate" covered property and the "loss the
13    Insured sustains . . . from the necessary interruption of the Insured's business" as a result of
14    such order.

15       5.      The toll of the Coronavirus and COVID-19 on lives, property, and businesses
16    in Arizona, the United States and around the world has been unprecedented and is among
17    the worst public health and economic catastrophes of the last 100 years.

18       6.      Indeed, to date COVID-19 has killed over 15,276 Arizonans,[1] over 500,000
19    Americans[2] and is now the third-leading cause of death in this country, surpassed only by
20    heart disease and cancer.[3] At its peak, over 4,000 Americans were perishing per day from

21

22

---

23    [1]    *Data Dashboard*, Arizona Department of Health Services (updated Feb. 18, 2021), https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php (last visited Feb. 18, 2021).
24    [2]    *Coronavirus Disease 2019 (COVID-19)*, CDC, (updated Feb. 22, 2021), https://covid.cdc.gov/covid-datatracker/#datatracker-home (last visited Feb. 22, 2021)
25    [3]    Gary Stix and Youyou Zhou, *COVID-19 Is Now the Third Leading Cause of Death in the U.S.*, SCI. AM., (Oct. 8, 2020), https://www.scientificamerican.com/article/covid-19-is-now-the-third-leading-cause-of-death-in-the-u-s1/ (last visited Feb. 12, 2021).
26

1  COVID-19.[4]  Thousands of Americans are still dying daily with surges of cases occurring

2  throughout the United States.[5]

3       7.     The physical loss of or damage to property and the economic devastation

4  wrought by the Coronavirus and COVID-19 is unprecedented.  The Coronavirus and

5  COVID-19 could result in net losses starting at $3.2 trillion and reaching as much as $4.8

6  trillion in U.S. real gross domestic product over two years.[6]

7       8.     The impact of the Coronavirus and COVID-19 on Arizona is also devastating.

8  As of February 18, 2021, Arizona has reported over 802,198 COVID-19 cases, including

9  more than 15,000 deaths.[7]

10      9.     While most sectors of the economy are struggling, the nation's healthcare

11 system has been particularly hard hit.  At least 47 hospitals in the U.S. closed or entered

12 bankruptcy as of October 16, 2020, as "lower patient volumes, canceled elective procedures

13 and higher expenses tied to the pandemic have created a cash crunch for hospitals."[8]  A

14 June 2020 report from the American Hospital Association estimated that U.S. hospitals

15 would lose more than $323 billion in 2020.[9]  An April 23, 2020 study found that the number

16 [4]   Eugene Garcia, Lisa Marie Pane and Thalia Beaty, *U.S. tops 4,000 daily deaths from

17 coronavirus for 1st time*, AP News, (Jan. 9, 2021), https://apnews.com/article/us-coronavirus-death-4000-daily-16c1f136921c7e98ec83289942322ee4 (last visited Feb. 12, 2021).

18 [5]   Coronavirus in the U.S.: Latest Map and Case Count, N.Y. Times, (updated Feb. 12, 2021), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Feb. 12,

19 2021); Johns Hopkins Medicine, *Coronavirus Second Wave? Why Cases Increase*, (updated Nov. 17, 2020), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/first-and-second-waves-of-coronavirus (last visited Feb. 17, 2021).

20 [6]   Emily Gersema, *Business closures and partial reopenings due to COVID-19 could cost the U.S.

21 trillions*, USC News (Nov. 30, 2020), https://news.usc.edu/178979/business-closures-covid-19-pandemic-united-states-gdp-

22 losses/#:~:text=The%20COVID%2D19%20pandemic%20could,years%2C%20a%20USC%20study%20finds (last visited Feb. 17, 2021).

23 [7]   *Data Dashboard*, Arizona Department of Health Services (updated Feb. 18, 2021), https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php (last visited Feb. 18, 2021).

24 [8]   Ayla Ellison, *47 hospitals closed, filed for bankruptcy this year*, Beckers Hospital CRO Report

25 (Oct. 16, 2020), https://www.beckershospitalreview.com/finance/47-hospitals-closed-filed-for-bankruptcy-this-year.html (last visited Feb. 18, 2021).

26 [9]   American Hospital Association, *Hospitals and Health Systems Continue to Face Unprecedented Challenges due to COVID-19* (June 2020),

-3-

1  of visits to ambulatory care practices declined by nearly 60 percent due to the effects of the

2  Coronavirus and COVID-19.[10]

3      10.    In the first month after the emergence of the Coronavirus and COVID-19,

4  nearly 420,000 Arizonans lost their jobs due to COVID-19, and approximately 7% of the

5  Arizona's workforce, 247,000 people, filed for unemployment compensation.[11]  Job losses

6  continued through the year.  On February 12, 2021, the Arizona Center for Economic

7  Progress reported "over 2.5 million Arizona households (46% of all Arizona households)

8  have had at least one member that has lost employment income" as a result of COVID-19.[12]

9  As of December 2020, Arizona's unemployment rate was 7.5%, drastically higher than its

10  4.5% rate in December 2019.[13]

11      11.    Arizona is also expected to suffer substantial revenue declines as a result of

12  COVID-19's impact on Arizona's economy.  In its April 9, 2020 Revenue and Budget

13  Update, Arizona's Joint Legislative Budget Committee projected a $1.1 billion shortfall by

14  the end of 2021.[14]  The Committee further predicted that COVID-19 would reduce the

15

16  https://www.aha.org/system/files/media/file/2020/06/aha-covid19-financial-impact-report.pdf (last visited Feb. 18, 2021).

17  [10]  Ateev Mehrotra, Michael Chernew, David Linetsky, Hilary Hatch, and David Cutler, *The Impact of the COVID-19 Pandemic on Outpatient Visits: A Rebound Emerges*, The Commonwealth Fund (May 19, 2020), https://www.commonwealthfund.org/publications/2020/apr/impact-covid-19-outpatient-visits (last visited Feb. 18, 2021).

19  [11]  Howard Fischer Capitol Media Services, *Nearly 420,000 Arizonans have lost their jobs due to the COVID-19 pandemic*, Arizona Daily Star: tuscon.com (updated Apr. 24, 2020), https://tucson.com/news/local/nearly-420-000-arizonans-have-lost-their-jobs-due-to-the-covid-19-pandemic/article_00f5a334-b3d4-53a6-8a0f-6dfc5423b6b4.html (last visited Feb. 18, 2021); *JLBC Staff – April 2020 Revenue and Budget Update*, Arizona Joint Legislative Budget Committee, (Apr. 9, 2020), https://www.azleg.gov/jlbc/040920revenueandbudgetupdate.pdf (last visited Feb. 18, 2021).

[12]  *Arizona in the time of COVID-19*, Arizona Center for Economic Progress (Feb. 12, 2021), https://azeconcenter.org/arizona-in-the-time-of-covid-19/ (last visited Feb. 18, 2021).

[13]  U.S. Bureau of Labor Statistics, *Local Area Unemployment Statistics Map* https://data.bls.gov/lausmap/showMap.jsp;jsessionid=0205536326E7E39D3DD68C1E8673D30._t3_08v (last visited Feb. 18, 2021).

[14]  *JLBC Staff – April 2020 Revenue and Budget Update*, Arizona Joint Legislative Budget Committee, (Apr. 9, 2020), https://www.azleg.gov/jlbc/040920revenueandbudgetupdate.pdf (last visited Feb. 18, 2021).

1   state's fourth quarter General Fund revenues by 24%, and that Arizona's growth rate would

2   decline by approximately 2.8% in 2020.[15]

3          12.      TMCH has suffered as a result of the Coronavirus and COVID-19.

4          13.      Rather than stand by its insured and honor its obligations under the Policy,

5   Continental turned its back on TMCH, and upon information and belief, many other

6   Arizonian insureds, forcing TMCH to turn to this Court for relief.

7          14.      As a not-for-profit health care organization devoted to improving the health

8   of the communities it serves, Continental's actions, if left unremedied, threaten TMCH's

9   ability to continue its vital mission.

10         15.      TMCH, directly or through subsidiaries, owns and operates Tucson Medical

11  Center ("TMC"), the largest hospital in Southern Arizona, and is affiliated with and operates

12  Benson Hospital, a rural critical access hospital in Benson, Arizona.  Additionally, through

13  TMC Medical Network (TMC's affiliated physician practice) ("TMN"), TMC owns and

14  operates a network of urgent care facilities, primary and specialty physician practices and

15  other complementary services, making it the leading provider of health and wellness care

16  in Southern Arizona.  TMC saw over 41,000 inpatients and observation patients, had 98,000

17  visits to its emergency department, and performed over 23,000 surgeries in 2019.  TMN

18  had over 38,000 patients, and over 166,000 patient visits in 2019.  Benson Hospital had a

19  total of 297 admissions in 2019, and 255 admissions in 2020, a reduction of 14%.  Benson

20  Hospital had 7,754 emergency department visits in 2019, and 7,097 emergency department

21  visits in 2020, a reduction of 8.5%.  TMCH was on track to meet or exceed these numbers

22  in 2020 prior to the impact of COVID-19..

23         16.      But in early 2020, the Coronavirus and COVID-19 struck Arizona, and they

24  struck hard.

25

26  [15]   *Id.*

-5-

1    17.    On January 26, 2020, the Arizona Department of Health Services announced
2  the state's first and the nation's fifth Coronavirus diagnosis.[16]  By July 2020, Arizona had
3  the highest "positivity rate" in the nation with an average of 25.3% of all tests for COVID-
4  19 coming back positive.[17]  Even as recently as December 2020, Arizona had the highest
5  COVID-19 transmission rate in the entire country.[18]

6    18.    The Coronavirus and COVID-19 have decimated lives and businesses,
7  causing widespread physical loss of or damage to property in the regions TMCH serves and
8  throughout Arizona.  The Coronavirus and COVID-19 have devastated TMCH's property
9  and business by causing direct physical loss of or damage to its property.

10    19.    TMCH experienced direct physical loss of or damage to its property in at least
11  four ways:  (1) through the certain or virtually certain presence of COVID-19 and/or the
12  Coronavirus throughout its hospitals, primary and specialty physician practices, and other
13  complementary services, in the air or on surfaces (whether in droplet nuclei, aerosols,
14  droplets or otherwise); (2) through state, local and agency governmental orders that
15  drastically limited TMCH's use of its property (including, but not limited to, the prohibition
16  of elective medical care procedures), causing TMCH to lose the total or partial normal use
17  and function of its property; (3) through the need to modify physical behaviors through the
18  use of social distancing, avoiding confined indoor spaces, and avoiding congregating in the

19  _____
[16]  Carrie Feibel, *Coronavirus Case Confirmed In Arizona, Bringing U.S. Total To 5*, NPR (Jan.
20  26, 2020), https://www.npr.org/sections/goatsandsoda/2020/01/26/799726161/coronavirus-case-
confirmed-in-arizona-bringing-u-s-total-to-5 (last visited Feb. 18, 2021); Arizona Department of
21  Health Services, *Public Health Agencies Confirm 2019 Novel Coronavirus Case in Arizona: The
Case is a Maricopa County Resident who Recently Returned from Wuhan, China* (Jan. 26, 2020),
https://www.azdhs.gov/director/public-information-office/index.php#news-release-012620    (last
22  visited Feb. 18, 2021).
[17]  Rachel Leingang & Alison Steinbach, *Arizona has highest percentage of positive COVID-19
23  tests in the US. Here's what it means*, The Arizona Republic (July 7, 2020),
https://www.azcentral.com/story/news/local/arizona-health/2020/07/07/why-arizonas-percent-
24  positive-tests-highest-country/5386600002/ (last visited Feb. 18, 2021).
[18]  Alex Devoid & Patty Machelor, *Tucson medical workers face full hospitals, unmanageable
25  patient loads*, Arizona Daily Star (updated Jan. 19, 2021), https://tucson.com/news/local/tucson-
medical-workers-face-full-hospitals-unmanageable-patient-loads/article_8c7c81b7-b08b-51a0-
26  9c98-39f66300c93c.html (last visited Feb. 18, 2021).

QB\203306.00100\67212728.1

1  same physical area as others, in order to reduce or minimize the potential for viral

2  transmission; and, (4) through the need to mitigate the threat or actual physical presence of

3  the Coronavirus on door handles, bedsheets, hospital gowns, bed railings, medical

4  equipment, miscellaneous surfaces, in heating and air conditioning systems, and any of the

5  multitude of other places the Coronavirus has or could be found.

6      20.    The presence of the Coronavirus in the air and on surfaces made TMCH's

7  facilities uninhabitable, unsafe, and unfit for their intended uses – just as if asbestos,

8  ammonia, fumes or a salmonella outbreak was in the air or on surfaces of the premises. As

9  a result, they had to operate at a limited capacity or close entirely.

10     21.    On March 19, 2020, Governor Ducey issued a supplemental Executive Order

11 that halted all elective surgeries in Arizona.[19] After the March 19, 2020 order, TMCH's

12 average daily patient count dropped from 500 patients a day to approximately 314 patients

13 per day.[20] TMCH had approximately $1.4 million in new COVID-19 related operating costs

14 in both March and April of 2020, and estimated a $20 million loss in revenue for April alone

15 due to an approximately 40% drop in monthly income.[21]

16     22.    While TMCH resumed elective procedures in a limited capacity on May 11,

17 2020, this interruption caused scheduling and staffing disruptions, and TMCH continued to

18 operate with extensive and costly health and safety protocols and numerous modifications

19 to its property.

20     23.    Despite complying with all required precautions, TMCH has not escaped the

21 spread of COVID-19.  To date, over 550 TMCH employees have reported that they

22 contracted COVID-19.

23

24 _____

[19] *Governor Ducey Announces Latest COVID-19 Actions*, Office of the Governor Doug Ducey
25 (Mar.  19,  2020),  https://azgovernor.gov/governor/news/2020/03/governor-ducey-announces-latest-covid-19-actions (last visited Feb. 18, 2021).
[20] *Id.*
26 [21] *Id.*

QB\203306.00100\67212728.1

24. To cushion the blow from the devastating impact of the Coronavirus and COVID-19, TMCH turned to its property insurer, Continental, to whom TMCH paid over $300,000 dollars in premium in exchange for $750 million in property damage and time element (also known as business interruption) coverage, effective October 1, 2019 to October 1, 2020. Continental, however, turned its back on TMCH and shirked its obligations under the Policy, putting TMCH's business and the vital services it provides to almost 300,000 Arizonans at risk.

25. Particularly, TMCH submitted a claim for physical loss of or damage to its property and business interruption, and other covered losses arising from the Coronavirus and COVID-19, but Continental has refused to provide coverage or even properly investigate TMCH's losses. What is more, Continental has rejected TMCH's request to extend the one-year deadline for TMCH to sue for coverage under the Policy, forcing TMCH to file this action to preserve and pursue its coverage rights.

26. Continental has abandoned TMCH in its darkest hour.

27. Continental's conduct is particularly egregious in light of its decision, made *after* the Policy was issued and *after* the prevalence and severity of the Coronavirus and COVID-19 became widely known, to make the following changes to its Signature Policy Form (the form on which the Policy is written):

  (a) Insert the word "virus" into its definition of the term "Microbe" and thereby expand the Policy's Fungi, Wet Rot, Dry Rot and Microbes Exclusion (the "Microbes Exclusion") to include viruses;[22]

  (b) Add a Communicable Disease Exclusion Endorsement excluding, among other things, "viruses" from a wide range of the Signature Policy Form's coverages.[23]

---

[22] *See* Continental's July 9, 2020 application to Washington, July 10, 2020 application to Oklahoma, and July 30, 2020 application to California, annexed hereto as Exhibit 2.
[23] *Id.*

-8-

1      28.    On information and belief, Continental and/or its affiliates sought permission
2  to amend the definition of "Microbe" to include "virus" and add a Communicable Disease
3  Exclusion Endorsement in every state where they could not make such change unilaterally.
4  Arizona is one such state that permits an insurer to make such changes unilaterally, without
5  further documentation with the state.

6      29.    On information and belief, after the Policy was issued, Continental amended
7  the Arizona property damage policies it issued on its Signature Policy Form to include
8  "virus" in the definition of "Microbe" and included a Communicable Disease Exclusion
9  Endorsement.

10      30.    On information and belief, Continental's efforts, after it sold the Policy to
11  TMCH, to amend its Signature Policy Form are admissions by Continental that the Policy's
12  Microbes Exclusion does not preclude coverage for losses caused by, arising from or related
13  to either the Coronavirus or COVID-19.

14      31.    Continental's efforts to amend its Signature Policy Form to add a
15  Communicable Disease Exclusion Endorsement excluding, among other things, "viruses"
16  from a wide range of the Signature Policy Form's coverages after it sold the Policy to
17  TMCH, are admissions by Continental that the Policy covers losses caused by, arising from
18  or related to either the Coronavirus or COVID-19.

19      32.    Continental's conduct also walks away from what CNA has told its investors
20  for years in its Annual Reports and 10-Ks in the "Risk Factors" section.

21      33.    In its 10-Ks, CNA stated: "Catastrophe losses are an inevitable part of our
22  business. Various events can cause catastrophe losses. These events can be natural or man-
23  made, and may include . . . pandemics . . . . The extent of our losses from catastrophes is a
24  function of the total amount of our insured exposures in the affected areas, the frequency
25  and severity of the events themselves . . . . It can take a long time for the ultimate cost of
26

QB\203306.00100\67212728.1

1   any catastrophe losses to us to be finally determined, as a multitude of factors contribute to

2   such costs, including . . . business interruption . . . ."[24]

3       34.   Despite its public disclosures, CNA has changed its tune and now claims that

4   its policies' business interruption coverage does not encompass TMCH's losses caused by

5   the pandemic.

6       35.   TMCH seeks damages for breach of contract against Continental for its failure

7   to honor its policy obligations.

8       36.   TMCH also seeks a judgment declaring the scope of Continental's obligation

9   to pay TMCH's losses under the Policy it sold to TMCH.

10                                      **THE PARTIES**

11       37.   TMCH is a non-profit corporation formed under the laws of Arizona with its

12   principal place of business in Tucson, Arizona.

13       38.   Upon information and belief, Continental is a corporation formed under the

14   laws of Illinois with its principal place of business in Illinois.

15                        **JURISDICTION AND VENUE**

16       39.   This Court has general personal jurisdiction over Continental pursuant to

17   Ariz. R. Civ. P. 4.2(a) and the United States Constitution because Continental carries on a

18   continuous and systematic part of its general business within Arizona, including but not

19   limited to marketing, selling, and issuing insurance policies to Arizona businesses and

20   insuring property in Arizona.

21       40.   This Court also has specific personal jurisdiction over Continental because

22   Continental contracted to insure property and/or risk located within this State at the time of

23   contracting, and out of which this action arose.  Ariz. R. Civ. P. 4.2(a).

24

25   [24] *See* CNA's Form 10-K for the fiscal year ended Dec. 31, 2019, at 7, https://sec.report/Document/0000021175-20-000017/ (last visited Feb. 18, 2021); CNA's Form 10-K for the fiscal year ended Dec. 31, 2018, at 7, https://seekingalpha.com/filing/3884450 (last visited

26   Feb. 18, 2021).

-10-

41.     Venue is proper in this Court pursuant to Arizona Revised Statutes §12-401 because Continental "resides without the state" and as such this "action may be brought in the county in which plaintiff resides" – *i.e*, Pima County where TMCH resides.

## FACTUAL BACKGROUND

**A.     TMCH**

42.     TMCH, directly or through subsidiaries, owns and operates TMC, the largest hospital in Southern Arizona, Benson Hospital, a 26-bed critical access hospital, and TMN, a network of urgent care facilities, primary and specialty physician practices and other complementary services operating in over fifteen (15) locations throughout Southern Arizona. TMCH currently has approximately 4,300 employees in Arizona, down from over 4,500 employees prior to the impact of the Coronavirus and COVID-19 on its operations.

43.     TMC had a total of 41,600 admissions in 2019, and 35,939 admissions in 2020, a reduction of 15.75%. TMC had 98,258 emergency department visits in 2019, and 72,172 emergency department visits in 2020, a reduction of 35.87%. Finally, TMC performed 23,439 surgeries in 2019, and 20,595 surgeries in 2020, a reduction of 13.80%. TMN had a total of 166,685 patient visits in 2019, and 169,815 patient visits in 2020, an increase of 1.87%. Benson Hospital had a total of 297 admissions in 2019, and 255 admissions in 2020, a reduction of 14%. Benson Hospital had 7,754 emergency department visits in 2019, and 7,097 emergency department visits in 2020, a reduction of 8.5%.

44.     As a nonprofit community-focused entity devoted to providing the very best care to patients regardless of their ability to pay, TMCH takes great pride in the work it does outside the walls of its facilities, from countless screenings, health fairs, educational sessions, bike-helmet fittings and a wide assortment of other wellness outreach activities.[25]

---

[25] *2019 Report to Our Community*, TMC Healthcare (Aug. 23, 2020), https://issuu.com/tucsonmedicalcenter/docs/tmc-664_report_to_community_2019_issuu (last visited Feb. 18, 2021).

-11-

1    45.    As a part of its prudent business practices and in recognition of its

2    responsibilities to its employees, its community and its patients, TMCH maintains insurance

3    coverage.

4    46.    TMCH specifically maintains "all-risk" commercial property coverage with

5    Continental, covering not only more commonly occurring risks but also entirely

6    unanticipated and novel risks that may arise.  As described below in greater detail, the

7    Policy provides coverage for all "*loss of or* damage to" TMCH's property, unless

8    specifically excluded.

9    **B.    The COVID-19 Pandemic**

10   47.    COVID-19 is a severe infectious disease caused by the Coronavirus.  COVID-

11   19 is responsible for over 109 million reported cases and at least 2.4 million deaths

12   worldwide.[26]  Unlike other members of the coronavirus family, which tend to cause mild-

13   to-moderate upper respiratory tract illness, the Coronavirus causes serious systemic illness

14   and death.[27]   COVID-19 has been declared a global pandemic by the World Health

15   Organization ("WHO"),[28] and as such, the disease and its causative virus, Coronavirus, are

16   presumed to be present or imminently present everywhere.[29]

17   48.    The existence and/or presence of the Coronavirus and COVID-19 is not

18   simply reflected in reported cases or individuals' positive test results.  The Centers for

---

[26]   Sergio Hernandez, Byron Manley, Henrik Pettersson, *Tracking coronavirus' global spread*, CNN         Health         (last         updated         Feb.         15,         2021), https://www.cnn.com/interactive/2020/health/coronavirus-maps-and-cases/ (last visited Feb. 15, 2021).

[27]   Tianna Hicklin, *Immune cells for common cold may recognize SARS-COV-2*, NAT. INST. OF HEALTH (Aug. 18, 2020), https://www.nih.gov/news-events/nih-research-matters/immune-cells-common-cold-may-recognize-sars-cov-2 (last visited Feb. 17, 2021).

[28]   WHO, *WHO Director-General's opening remarks at the media briefing on COVID-19* (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited Feb. 12, 2021).

[29]   *See, e.g.*, Christopher Ingraham, *At the population level, the coronavirus is almost literally everywhere*,         WASH.         POST,         Apr.         1,         2020, https://www.washingtonpost.com/business/2020/04/01/population-level-coronavirus-is-almost-literally-everywhere/ (last visited Feb. 12, 2021).

-12-

Disease Control and Prevention ("CDC") estimates that the number of people in the United States who have been infected with COVID-19 is likely to be 10 times higher than the number of reported cases.[30]  Additionally, at least 40% of people infected with COVID-19 are asymptomatic.[31]  COVID-19 also includes a pre-symptomatic incubation period of up to 14 days, during which time infected people can transmit COVID-19 to people and onto surfaces without having experienced symptoms and without realizing that they are infected.[32]  Studies have demonstrated that pre-symptomatic individuals have an even greater ability to transmit COVID-19 than other infected people because they carry the greatest "viral load."[33]  The National Academy of Sciences has concluded that "the majority of transmission is attributable to people who are not exhibiting symptoms, either because they are still in the pre-symptomatic stage or the infection is asymptomatic."[34]

49.   As early as February 26, 2020, the CDC advised that COVID-19 was spreading freely without the ability to trace the origin of new infections, also known as community transmission.

---

[30]   Lena H. Sun and Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported,* WASH. POST (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/ (last visited Feb. 17, 2021).

[31]   Ellen Cranley, *40% of people infected with covid-19 are asymptomatic, a new CDC estimate says,* BUS. INSIDER (July 12, 2020), https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7 (last visited Feb. 17, 2021).

[32]   *See* WHO, *Coronavirus disease 2019 (COVID-19) Situation Report - 73* (Apr. 2, 2020), https://apps.who.int/iris/bitstream/handle/10665/331686/nCoVsitrep02Apr2020-eng.pdf?sequence=1&isAllowed=y (last visited Feb. 17, 2021); Minghui Yang , Liang Li , Ting Huang, Shaxi Li, Mingxia Zhang, Yang, Yujin Jiang, Xiaohe Li, Jing Yuan, and Yingxia Liu, *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19,* 203 AM. J. OF RESPIRATORY AND CRITICAL CARE MED. 3, 374-78 (Feb. 1, 2021), https://doi.org/10.1164/rccm.202006-2136LE (last visited Feb. 18, 2021).

[33]   *See, e.g.*, Xi He et al., *Temporal dynamics in viral shedding and transmissibility of COVID-19,* 26 NATURE MED. 672, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 (last visited Feb. 17, 2021); Lirong Zou, et al., *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients,* NEW ENG. J. OF MED. (Mar. 19, 2020).

[34]   Meagan C. Fitzpatrick, Alison P. Galvani, Seyed M. Moghadas, Abhishek Pandey, Pratha Sah, Affan Shoukat, and Burton H. Singer, *The implications of silent transmission for the control of COVID-19 outbreaks*, 117 PNAS 30, 17513-15, July 28, 2020 https://www.pnas.org/content/117/30/17513 (last visited Feb. 12, 2021).

1        50.     On March 11, 2020, the WHO declared COVID-19 to be a global pandemic.

2        51.     COVID-19 is highly contagious, uniquely resilient, and potentially deadly.
3   The degree to which an infectious disease is contagious is measured by $R^0$, a term that
4   defines how many other people will become infected by one person with that disease.
5   Studies have concluded that one person with the Coronavirus will infect up to 5.7 others
6   ($R^0 \approx 5.7$), much higher than seasonal influenza for example, where on average, one person
7   will infect only 1.3 others ($R^0 \approx 1.3$).[35]

8        52.     The Coronavirus can remain infectious for "much longer time periods than
9   generally considered possible."[36]  In the Journal of Virology, researchers demonstrated that
10  the Coronavirus can survive up to 28 days at room temperature (68°F) on a variety of
11  surfaces including glass, steel, vinyl, plastic, and paper.[36]  A CDC report from March 27,
12  2020, stated that the Coronavirus was identified on surfaces of the cabins on board the
13  Diamond Princess cruise ship 17 days after the cabins were vacated but before they were
14  disinfected.[37]  Numerous other scientific studies and articles have identified the persistence
15  of the Coronavirus on doorknobs, toilets, faucets and other high-touch points, as well as on
16  commonly overlooked surfaces such as floors.[38]

---

[35]   M. Cevik, C.C.G. Bamford, A. Ho, *COVID-19 pandemic-a focused review for clinicians*, 26 CLINICAL   MICROBIOLOGY   &   INFECTION   7,   842-47   (July   2020), https://www.clinicalmicrobiologyandinfection.com/article/S1198-743X(20)30231-7/fulltext  (last visited Feb. 17, 2021).

[36]   Shane Riddell, Sarah Goldie, Andrew Hill, Debbie Eagles & Trevor W. Drew, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 VIROLOGY J. 145 (2020), https://doi.org/10.1186/s12985-020-01418-7 (last visited Feb. 12, 2021).

[37]   Leah F. Moriarty, Mateusz M. Plucinski, Barbara J. Marston, et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020*, 69 MMWR 12, 347-352, (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited Feb. 12, 2021).

[38]   Zhen-Dong Guo, Zhong-Yi Wang, Shou-Feng Zhang, Xiao Li, Lin Li, Chao Li, Yan Cui, Rui-Bin Fu, Yun-Zhu Dong, Xiang-Yang Chi, Meng-Yao Zhang, Kun Liu, Cheng Cao, Bin Liu, Ke Zhang, Yu-Wei Gao, Bing Lu, Wei Chen, *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020*, 26 EMERG. INFECT. DIS. 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited Feb. 17, 2021).

53.     The WHO states that "[t]he disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks . . . . People can catch COVID-19 if they breathe in these droplets from a person infected with the virus . . . . These droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails.  People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth."[39]

54.     Arizona and Pima County experienced a reported COVID-19 outbreak in March 2020, and TMCH and the communities it serves have experienced dramatic increases in the number of cases thereafter.[40]

**C.     The Coronavirus and COVID-19 Cause Direct Physical Loss of or Damage to Property**

55.     The omnipresence of the Coronavirus and COVID-19 is enabled by multiple modes of viral transmission, including respiratory droplet, airborne, and fomite transmission (i.e., transmission from surfaces and objects).[41]  These transmission methods demonstrate that the Coronavirus and/or COVID-19 cause direct physical loss of or damage to property.

56.     Respiratory transmission of COVID-19 occurs through exposure to an infected person's respiratory particles, such as from saliva or mucus.[42]  Respiratory transmission of the Coronavirus is commonly divided into droplet (larger particles that have a transmission range of about six feet) and airborne (smaller particles that can remain

---

[39]  *Q&A on coronaviruses (COVID-19)*, World Health Organization, https://web.archive.org/web/20200506094904/https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited Feb. 12, 2021).

[40]  Alexa Block, *Looking back at the timeline of coronavirus in Arizona*, Arizona Channel 12 News (Sept. 28, 2020), https://www.12news.com/article/news/local/arizona/timeline-of-coronavirus-in-arizona/75-69c216df-6773-4b25-a34d-5a397d049196 (last visited Feb. 18, 2021).

[41]  *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Feb. 12, 2021).

[42]  *Id.*

QB\203306.00100\67212728.1

1    suspended in the air for prolonged periods of time) modes of transmission. Though

2    convenient, this binary division is an oversimplification that underscores transmission

3    risk.[43] Humans produce a wide range of particle sizes when coughing, sneezing, talking,

4    singing, or otherwise dispersing droplets, with pathogens predominating in the smallest

5    particles.[44] Respiratory particles produced by the average person can travel almost 20 feet

6    by sneezing.[45] An M.I.T. researcher has found that virus-laden "clouds" containing clusters

7    of droplets can travel 23 to 27 feet.[46]

8        57.   Airborne transmission involves the spread of the infectious agent caused by

9    the dissemination of droplet nuclei (aerosols) from, *e.g.*, exhaled breath, that remain

10   infectious when suspended in the air over long distances and time.[47] These tiny particles

11   can remain suspended "for indefinite periods unless removed by air currents or dilution

12   ventilation."[48] As a result, the risk of disease transmission increases substantially in

13   enclosed environments, compared to outdoor settings.[49]

---

[43]   Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Feb. 17, 2021).

[44]   *Id.*

[45]   *Id.*

[46]   Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions, Potential Implications for Reducing Transmission of COVID-19*, 323 JAMA 18, 1837-38, Mar. 26, 2020, https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited Feb. 12, 2021).

[47]   *Id; see also* Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act,* TIME, Aug. 25, 2020, https://time.com/5883081/covid-19-transmitted-aerosols/ (last visited Feb. 12, 2021); Ramon Padilla & Javier Zarracina, *Coronavirus might spread much farther than 6 feet in the air. CDC says wear a mask in public,* (last updated Sept. 21, 2020), www.usatoday.com/in-depth/news/2020/04/03/coronavirusprotection-how-masks-might-stop-spread-throughcoughs/5086553002/ (last visited Feb. 12, 2021); Nan Zhang, Jianjian Wei, Hui-Ling Yen, and Yuguo Li, *Short-range airborne route dominates exposure of respiratory infection during close contact,* 176 BLDG. AND ENV'T (June 2020).

[48]   Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Feb. 17, 2021).

[49]   Muge Cevik, Julia L Marcus, Caroline Buckee, & Tara C Smith, *Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Transmission Dynamics Should Inform Policy*, CLINICAL INFECTIOUS DISEASES (2020), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa1442/5910315 (last visited Feb. 17, 2021).

1    58.    The WHO and the scientific community have studied the spread of the

2    Coronavirus through aerosols in indoor settings via air circulation systems.  For example,

3    the CDC published a research letter concluding that a restaurant's air conditioning system

4    triggered transmission of the Coronavirus, spreading it to people who sat at separate tables

5    downstream of the restaurant's airflow.[50]

6    59.    Additionally, the CDC has stated that "there is evidence that under certain

7    conditions, people with COVID-19 seem to have infected others who were more than 6 feet

8    away" and infected people who entered the space shortly after the person with COVID-19

9    had left.[51]  A recently published (February 2021) systematic review of airborne transmission

10    of the Coronavirus corroborated the CDC's concerns and recommended procedures to

11    improve ventilation of indoor air environments to decrease bioaerosol concentration and

12    reduce the Coronavirus' spread.[52]

13    60.    The CDC has recommended "ventilation interventions" to help reduce

14    exposures to the airborne Coronavirus in indoor spaces, including increasing airflow and

15    air filtration (such as with high-efficiency particulate air (HEPA) fan/filtration systems).[53]

---

[50]  Jianyun Lu, Jieni Gu, Kuibiao Li, Conghui Xu, Wenzhe Su, Zhisheng Lai, Deqian Zhou, Chao Yu, Bin Xu, and Zhicong Yang, *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last visited Feb. 12, 2021); *see also* Keun-Sang Kwon, Jung-Im Park, Young Joon Park, Don-Myung Jung, Ki-Wahn Ryu, and Ju-Hyung Lee, *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea*, 35 J. KOREAN MED. SCI. 46 (Nov. 2020), https://doi.org/10.3346/jkms.2020.35.e415 (last visited Feb. 12, 2021).

[51]  CDC, *Ways COVID-19 Spreads* (last updated Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-*getting*-sick/how-covid-spreads.html (last visited Feb. 17, 2021).

[52]  Zahra Noorimotlagh, Neemat Jaafarzadeh, Susana Silva Martínez, & Sevved Abbas Mirzaee, *A systematic review of possible airborne transmission of the COVID-19 virus (SARS-CoV-2) in the indoor air environment*, 193 ENV'T RSCH. 110612, 1-6 (Feb. 2021), https://www.sciencedirect.com/science/article/pii/S0013935120315097?dgcid=rss_sd_all (last visited Feb. 17, 2021).

[53]  CDC, *Ventilation in Buildings* (last updated Feb. 9, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more,with%20SARS%2DCoV%2D2 (last visited Feb. 12, 2021).

QB\203306.00100\67212728.1

1　The CDC has recommended that in addition to ventilation changes, healthcare providers

2　make various modifications to their facilities, including installing barriers and creating

3　outdoor triage stations.[54] These and other remedial measures must be implemented, at high

4　cost and extra expense, to reduce the amount of the Coronavirus present in the space and

5　make property safe for its intended use.  These extreme measures demonstrate that the

6　Coronavirus and COVID-19 cause direct physical loss of or damage to interior spaces.

7　　　　61.　　COVID-19 may also be transmitted to people from physical objects, materials

8　or surfaces.  "Fomites" are physical objects or materials that carry, and are capable of

9　transmitting infectious agents, altering these objects to become vectors of disease.[55] Fomite

10　transmission has been demonstrated as highly efficient for viruses, both from object-to-

11　hand and from hand-to-mouth.[56]

12　　　　62.　　The WHO has described fomite transmission as follows:

13　　　　Respiratory secretions or droplets expelled by infected individuals can
14　　　　contaminate surfaces and objects, creating fomites (contaminated surfaces).
　　　　　**Viable SARS-CoV-2 virus and/or RNA detected by RT-PCR can be**
15　　　　**found on those surfaces for periods ranging from hours to days**,
16　　　　depending on the ambient environment (including temperature and humidity)
　　　　　and the type of surface, in particular at high concentration in health care
17　　　　facilities where COVID-19 patients were being treated.   Therefore,
　　　　　transmission may also occur indirectly through touching surfaces in the
18　　　　immediate environment or objects contaminated with virus from an infected
19　　　　person . . . .[57] (Emphasis added).

20

21　[54] CDC,　　*Infection　　Control　　Guidance*　　(updated　　Feb.　　10,　　2021),
　　　https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html　　(last
22　　visited Feb. 18, 2021).
　　　[55] Merriam-Webster　　Dictionary,　　https://www.merriam-webster.com/dictionary/fomite　　(last
23　　visited Feb. 12, 2021).
　　　[56] P. Rusin, S. Maxwell, & C. Gerba, *Comparative surface-to-hand and fingertip-to-mouth*
24　　*transfer efficiency of gram-positive bacteria, gram-negative bacteria, and phage*, 93 J. OF APPLIED
　　　MICROBIOLOGY, 4, 585-92 (Sept. 18, 2002) https://pubmed.ncbi.nlm.nih.gov/12234341/ (last
25　　visited Feb. 18, 2021).
　　　[57] *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention*
26　　*precautions* (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-
　　　sars-cov-2-implications-for-infection-prevention-precautions (last visited Feb. 12, 2021).

-18-

1    63.    In addition to studies cited by the WHO,[58] numerous other studies and

2    scientific articles have discussed fomite transmission as a mode of virus transmission,

3    including, but not limited to:

4        a.    A study of a COVID-19 outbreak published by the CDC identifying

5            elevator buttons and restroom taps as possible causes of the "rapid

6            spread of SARS-CoV-2" in a shopping mall in China.[59]

7        b.    A National Institutes of Health study published in the New England

8            Journal of Medicine finding that the Coronavirus survives up to 4

9            hours on copper, up to 24 hours on cardboard, and up to 3 days on

10           plastic and stainless steel, and suggesting that people may acquire the

11           virus through the air and after touching contaminated objects.[60]

12       c.    An American Society for Microbiology article discussing fomite

13           infection as involving both porous and non-porous surfaces, and

14           occurring through a fomite's contact with bodily secretions, hands,

15           aerosolized virus from talking, sneezing, coughing, etc., or other

16           airborne viral particles that settle after a disturbance of a fomite (*e.g.*,

17           shaking a contaminated blanket).[61]   According to the researchers,

18           "[o]nce a fomite is contaminated, the transfer of infectious virus may

19           readily occur between inanimate and animate objects, or vice versa,

20

21   [58]   *Id.*

22   [59]   CDC, Jing Cai, Wenjie Sun, Jianping Huang, Michelle Gamber, Jing Wu, Guiqing He, *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIONS DISEASES 6 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last

23   visited Feb. 12, 2021).

24   [60]   National Institutes of Health, *New coronavirus stable for hours on surfaces* (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces   (last visited Feb. 12, 2021).

25   [61]   Stephanie A. Bone and Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral* Disease, 73 APPLIED AND ENVIRONMENTAL MICROBIOLOGY 6, 1687-96 (Mar.

26   2007) https://aem.asm.org/content/73/6/1687 (last visited Feb. 12, 2021).

-19-

1      and between two separate fomites (if brought together)."[62]  Of course,

2      materials like blankets, hospital beds, computer terminals and a huge

3      variety of medical equipment that come into contact with droplets and

4      hands are handled thousands of times a day.  Generally, frequently

5      touched surfaces can become highly transmissive fomites.[63]

6      d.    A CDC research letter reporting that the Coronavirus can remain

7         viable on polystyrene plastic, aluminum, and glass for 96 hours in

8         indoor living spaces.[64]

9      e.    A *Journal of Hospital Infection* article citing studies revealing that

10         human coronaviruses can persist on inanimate surfaces like metal,

11         glass, or plastic for up to 9 days.[65]

12    64.    Importantly, the Coronavirus has been detected on environmental objects and

13 surfaces from both symptomatic and asymptomatic individuals.[66]  Fomites transform the

14 surface of property into a potentially deadly Coronavirus transmission device.  A study

15 published in the Journal of Epidemiology and Infection demonstrated that after lockdown

16 in the United Kingdom, Coronavirus transmission via fomites may have contributed to as

17 many as 25% of deaths in that region.[67]

---

[62]  *Id.*

[63]  *Id.*

[64]  CDC, Boris Pastorino, Franck Touret, Magali Gilles, Xavier de Lamballerie, and Rémi N. Charrel, *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 EMERGING INFECTIOUS DISEASES 9 (Sept. 2020), https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article (last visited Feb. 12, 2021).

[65]  G. Kampf, D. Todt, S. Pfaender, E. Steinmann, *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, J. OF HOSPITAL INFECTION 104, 246-51 (2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (last visited Feb. 12, 2021).

[66]  Minghui Yang, Liang Li, Ting Huang, Shaxi Li, Mingxia Zhang, Yang, Yujin Jiang, Xiaohe Li, Jing Yuan, and Yingxia Liu, *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, 203 AM. J. OF RESPIRATORY AND CRITICAL CARE MED. 3, 374-78 (Dec. 16, 2020), https://doi.org/10.1164/rccm.202006-2136LE (last visited Feb. 17, 2021).

[67]  A. Meiksin, *Dynamics of COVID-19 transmission including indirect transmission mechanisms: A mathematical analysis*, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (2020), https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamics-of-

1   65.   Accordingly, the presence of the Coronavirus in and on property, including
2   in indoor air, on surfaces, and on objects, causes direct physical loss of or damage to
3   property by causing physical harm to and altering property and otherwise making it
4   incapable of being used for its intended purpose.

5   66.   Among other things, the presence of the Coronavirus transforms everyday
6   surfaces and objects into fomites, causing a tangible change of the property into a
7   transmission vehicle for disease from one host to another. The WHO's description of fomite
8   transmission of COVID-19 expressly recognizes this physical alteration of property,
9   describing viral droplets as "**creating** fomites (contaminated surfaces)"[68] (emphasis added).
10  "Creating" involves making or bringing into existence something new[69] – such as
11  something that is in an altered state from what it was before the Coronavirus was present
12  on, in and around the property.

13  67.   The Coronavirus adheres to surfaces and objects, harming and physically
14  changing and physically altering those objects by becoming a part of their surface and
15  making physical contact with them unsafe for their ordinary and customary use. Once the
16  Coronavirus is in, on, or near property, it is easily spread by the air, people and objects from
17  one area to another, causing additional direct physical loss of or damage.

18  68.   Additionally, the presence of the Coronavirus in and on property, including
19  in indoor air, on surfaces, and on objects, renders the property unsafe and unfit for its normal
20  usage. Respiratory particles (including droplets and airborne aerosols) and fomites are
21  physical substances that alter the physical properties of the interiors of buildings to make
22  them unsafe, untenantable and uninhabitable.

23  covid19-transmission-including-indirect-transmission-mechanisms-a-mathematical-
    analysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited Feb. 17, 2021).
24  [68]   *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention*
    *precautions* (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-
25  sars-cov-2-implications-for-infection-prevention-precautions (last visited Feb. 12, 2021).
    [69]   *See, e.g.,* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/create
26  (last visited Feb. 12, 2021).

-21-

1    69.    In addition to being found in air samples,[70] the Coronavirus remains stable in

2    body secretions (respiratory, urine, feces), on surfaces, and in sewage, particularly at lower

3    temperatures.[71]

4    70.    A number of studies have demonstrated that the Coronavirus is "much more

5    resilient to cleaning than other respiratory viruses tested."[72]   The measures that must be

6    taken to remove the Coronavirus from property are significant and far beyond ordinary

7    cleaning.

8    71.    Efficacy of decontaminating agents for viruses are based on a number of

9    factors, including the initial amount of virus present, contact time with the decontaminating

10   agent, dilution, temperature, and pH, among many others. Detergent surfactants are not

11   recommended as single agents, but rather in conjunction with complex disinfectant

12   solutions.[73]

13   72.    Additionally, it can be challenging to accurately determine the efficacy of

14   decontaminating agents.    The toxicity of an agent may inhibit the growth of cells used to

15   determine the presence of virus, making it difficult to determine if lower levels of infectious

16   virus are actually still present on treated surfaces.[74]

17   73.    In order to be effective, cleaning and decontamination procedures require

18   strict adherence to protocols not necessarily tested under "real life" or practical conditions,

19   [70]   Zhen-Dong Guo, Zhong-Yi Wang, Shou-Feng Zhang, Xiao Li, Lin Li, Chao Li, Yan Cui, Rui-
20   Bin Fu, Yun-Zhu Dong, Xiang-Yang Chi, Meng-Yao Zhang, Kun Liu, Cheng Cao, Bin Liu, Ke
     Zhang, Yu-Wei Gao, Bing Lu, Wei Chen, *Aerosol and Surface Distribution of Severe Acute*
21   *Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020,* 26 EMERG. INFECT.
     DIS. 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited Feb. 17,
     2021).
22   [71]   Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their*
23   *potential    surrogates,*    92    J.    OF    MED.    VIROLOGY    11,    2498-510    (June
     2020), https://doi.org/10.1002/jmv.26170 (last visited Feb. 17, 2021).
24   [72]   *Id.*
     [73]   *Id.*
     [74]   Muge Cevik, Julia L Marcus, Caroline Buckee, & Tara C Smith, *Severe Acute Respiratory*
25   *Syndrome Coronavirus 2 (SARS-CoV-2) Transmission Dynamics Should Inform Policy,* CLINICAL
     INFECTIOUS    DISEASES    (2020),    https://academic.oup.com/cid/advance-
26   article/doi/10.1093/cid/ciaa1442/5910315 (last visited Feb. 17, 2021).

1   where treated surfaces or objects may not undergo even exposure or adequate contact time.[75]

2   Studies of coronaviruses have demonstrated viral RNA persistence on objects despite

3   cleaning with 70% alcohol.[76]

4       74.    When considering disinfection and decontamination, the safety of products

5   and procedures must be considered as well, due to the risks of harmful chemical

6   accumulation, breakdown of treated materials, flammability, and potential for allergen

7   exposure.[77]

8       75.    With respect to textiles, studies have demonstrated that virus can survive on

9   fabrics and be transferred to skin and other surfaces, "suggesting it is biologically plausible

10   that . . . infectious diseases can be transmitted directly through contact with contaminated

11   textiles."[78]  Given the inadequacy of conventional cleaning procedures, disinfection and

12   decontamination measures include, but are not limited to, the use of harsh chemicals to

13   perform deep disinfection, the removal and disposal of porous materials like clothing, cloth

14   and other fabrics, making changes to air filtration systems, and redesigning interior spaces,

15   all performed at great cost and expense to the Resorts.  These measures, among others,

16   demonstrate that the Coronavirus and COVID-19 cause direct physical loss, damage or

17   destruction to property.

18

19

20

---

21   [75]  *Id.*

[76]  Joon Young Song, Hee Jin Cheong, Min Joo Choi, Ji Ho Jeon, Seong Hee Kang, Eun Ju Jeong,

22   Jin Gu Yoon, Saem Na Lee, Sung Ran Kim, Ji Yun Noh, & Woo Joo Kim, *Viral Shedding and Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47

23   INFECTION & CHEMOTHERAPY 4, 252-5 (2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252 (last visited Feb. 18, 2021).

24   [77]  *Id.*

25   [78]  Lucy Owen and Katie Laird, *The role of textiles as fomites in the healthcare environment: a review of the infection control risk*, 8 PEER J. LIFE AND ENV'T e9790, 1-35 (2020),

26   https://peerj.com/articles/9790/ (last visited Feb. 17, 2021).

1       76.     Many of the surfaces and materials discussed in the studies and articles cited

2   above are used throughout TMCH and as part of its operations, including plastics, glass,

3   metals and cloth and fabrics such as blankets.

4       77.     Over 550 of TMCH's employees have contracted COVID-19. Given the high

5   percentage of asymptomatic cases of COVID-19, it is certain that the actual number of

6   TMCH employees who had contracted COVID-19 was substantially greater than the over

7   550 employees known to have contracted COVID-19.

8       78.     The above is direct proof of the actual, certain presence of the Coronavirus

9   on TMCH's property.

10      79.     Additionally, given how highly contagious the Coronavirus is, its multiple

11   modes of transmission, the global pervasive status of COVID-19 and its heavy toll

12   throughout Arizona, it is statistically certain or near-certain that many other individuals at

13   or in the vicinity of TMCH's properties contracted and carried the Coronavirus. It is also

14   statistically certain or near-certain that the Coronavirus was dispersed continuously into the

15   air and on property in and around such properties.

16      80.     The presence of the Coronavirus and COVID-19 in, on, and near property

17   therefore caused and continues to cause direct physical loss of or damage to TMCH's

18   property, resulting in business income loss covered under the Policy.

19      81.     This direct physical loss of or damage to TMCH's property required TMCH

20   to close specific properties, sharply limit routine patient care at others, incur extra expense,

21   and undertake costly efforts to protect and preserve property from further damage or loss.

22   Even after resuming elective medical procedures, the many remaining restrictions

23   continued to limit TMCH's operations and require extensive ongoing remediation and

24   decontamination procedures, all resulting in losses above $60 million.

25

26

-24-

**D.     The Certain or Virtually Certain Presence of the Coronavirus at TMCH**

82.     Arizona, like much of the nation, experienced dramatic COVID-19 outbreaks in mid- and late-March 2020.[79]  Up until March 2020, TMCH was treating patients at approximately the same pace as 2019 across TMC, Benson Hospital and TMN.  Moreover, as discussed above, over 550 TMCH employees were diagnosed with COVID-19.

83.     The presence of the Coronavirus at TMCH's properties, was certain or virtually certain.  This can be confirmed with certainty or near-certainty by statistical modeling based on the known incidences of infection despite the lack of commercially available tests for fomite or the aerosolized Coronavirus, and despite the shortage of COVID-19 tests that could have otherwise been administered to every individual who was on-site at the relevant times.[80]

84.     Early in the course of the Coronavirus and COVID-19, testing was limited, and thus potentially thousands more people were infected than was reported.[81]  Concerning the testing that was available at that time, local positivity rates clearly demonstrated the pervasiveness of the Coronavirus throughout Arizona and in the counties where TMCH operates.  Epidemiologists have explained that "the percent positive is a critical measure because it gives us an indication of how widespread infection is in the area where the testing is occurring[.]"[82]  It is a crucial indicator of whether a business can safely remain open.  As

[79]   Alexa Block, *Looking back at the timeline of coronavirus in Arizona*, Arizona Channel 12 News (Sept. 28, 2020), https://www.12news.com/article/news/local/arizona/timeline-of-coronavirus-in-arizona/75-69c216df-6773-4b25-a34d-5a397d049196 (last visited Feb. 18, 2020).
[80]   *See, e.g.*, Aroon Chande, Seolha Lee, Mallory Harris, Quan Nguyen, Stephen J. Beckett, Troy Hilley, Clio Andris, & Joshua S. Weitz, *Real-time, interactive website for US-county-level COVID-19 event risk assessment*, 4 NAT. HUMAN BEHAVIOR, 1313-19 (Nov. 9, 2020), https://doi.org/10.1038/s41562-020-01000-9 (last visited Feb. 12, 2021).
[81]   *See, e.g.*, Benedict Carey and James Glanz, *Hidden Outbreaks Spread Through U.S. Cities Far Earlier Than Americans Knew, Estimates Say*, N.Y. TIMES (Apr. 23, 2020), (updated July 6, 2020), nytimes.com/2020/04/23/us/coronavirus-early-outbreaks-cities.html (last visited Feb. 12, 2021).
[82]   David Dowdy and Gypsyamber D'Souza, *COVID-19 Testing: Understanding the "Percent Positive"*, Johns Hopkins Bloomberg School of Public Health Expert Insights (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html (last visited Feb. 12, 2021).

1    a threshold for the percent positive being "too high," the WHO stated that the percent
2    positive should remain below 5% for at least two weeks before reopening.[83]  By July 2020,
3    Arizona had the highest "positivity rate" in the nation with an average of 25.3% of all tests
4    for COVID-19 coming back positive.[84]  Even as recently as December 2020, Arizona had
5    the highest COVID-19 transmission rate in the entire country.[85]

6          85.    TMCH was prohibited from conducting elective surgeries as of March 19,
7    2020, and resumed such procedures on May 11, 2020 in a limited capacity.  Throughout
8    this time and continuing thereafter, TMCH adopted extensive health and safety protocols
9    that also limited the number of patients receiving treatment.

10         86.    These closures and events were due to direct physical loss of or damage to
11   property caused by the Coronavirus and COVID-19, and as a result of the loss of the ability
12   to operate TMCH's properties safely or without draconian restrictions and modifications to
13   property and procedures.  Also, during this time, Arizona Governor Dough Ducey issued
14   numerous emergency orders addressing the health and public safety crisis caused by the
15   outbreak and requiring the use of decontamination and other health and safety protocols in
16   an effort to limit exposure to and transmission of the Coronavirus.

17         87.    The governor's emergency orders were issued for a number of reasons.  These
18   include physical loss of or damage to property caused by the Coronavirus and COVID-19;
19   the ability of the Coronavirus and COVID-19 to be transmitted through fomites; and the
20   ability of the Coronavirus and COVID-19 to survive on surfaces for days, linger in indoor

---

[83]  *Id.*
[84]  Rachel Leingang & Alison Steinbach, *Arizona has highest percentage of positive COVID-19 tests in the US. Here's what it means*, The Arizona Republic (July 7, 2020), https://www.azcentral.com/story/news/local/arizona-health/2020/07/07/why-arizonas-percent-positive-tests-highest-country/5386600002/ (last visited Feb. 18, 2021).
[85]  Alex Devoid & Patty Machelor, *Tucson medical workers face full hospitals, unmanageable patient loads*, Arizona Daily Star (updated Jan. 19, 2021), https://tucson.com/news/local/tucson-medical-workers-face-full-hospitals-unmanageable-patient-loads/article_8c7c81b7-b08b-51a0-9c98-39f66300c93c.html (last visited Feb. 18, 2021).

QB\203306.00100\67212728.1

1    air, and transform surfaces and air into vehicles of virus transmission, thereby rendering

2    property unsafe for normal use.

3    **E.**    **Government Orders And The Impact On TMCH's Properties**

4    88.    On March 16, 2020, the CDC and the national Coronavirus Task Force issued

5    public guidance titled "30 Days to Slow the Spread" of COVID-19, which called for

6    restrictive social distancing measures, such as working from home, avoiding gatherings of

7    more than 10 people and staying away from bars and restaurants.[86]

8    89.    State and local governments recognized the unprecedented and mushrooming

9    outbreaks of COVID-19 across the nation and the Coronavirus' catastrophic impact through

10    the direct physical loss of or damage to property and lives. As a consequence, many states

11    issued "State of Emergency" Declarations in early March 2020. As detailed below, within

12    a short time, the State of Arizona followed suit and issued orders suspending or severely

13    limiting business operations where people could potentially contract COVID-19.

14    Healthcare providers, such as TMCH, were barred from conducting elective medical

15    procedures, and subject to extensive disinfection and safety protocols.

16    90.    On March 11, 2020, Governor Doug Ducey declared a state of emergency

17    because the state health services had identified "9 cases of COVID-19, including cases

18    spreading in the community, and [had] additional patients under investigation linked to the

19    global outbreak."[87] This declaration was issued to "ensure the spread of COVID-19 is

20    controlled and that the residents of Arizona remain safe and healthy."[88] Governor Ducey

21

22

23    [86] The President's Coronavirus Guidelines for America, *30 Days to Slow the Spread*, The White House and CDC (Mar. 16, 2020), https://*trumpwhitehouse*.archives.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited Feb. 17, 2021).

24

25    [87] Arizona Declaration of Emergency - COVID-19 (Mar. 11, 2020), https://www.fmcsa.dot.gov/emergency/arizona-declaration-emergency-covid-19 (last visited Feb. 18, 2021).

26    [88] *Id.*

1    expressly noted that "public health and health care systems" such as TMCH "have identified
2    precautions and interventions that can mitigate the spread of COVID-19."[89]

3        91.    That same day, Governor Ducey also issued Executive Order 2020-07, titled
4    "Proactive Measures to Protect Against COVID-19" which sought to provide healthcare
5    providers with guidelines necessary to combat the continued spread of COVID-19.[90]
6    Noting that "it is important to institute enhanced protections at facilities that treat
7    populations most at risk if they contact COVID-19" and that "visits by telemedicine can
8    reduce the spread of disease by allowing potentially contagious patients to see a doctor
9    without visiting an office, clinic, urgent care center or hospital where other individuals
10   could be exposed[,]" this order directed the Arizona Department of Health Services to issue
11   emergency rules for skilled nursing facilities, intermediate care facilities and assisted living
12   facilities.  The emergency rules required:

13           a.    "Instituting policies to require screening and triage before entry by
14                 staff, visitors and contractors;

15           b.    Establishing disinfectant schedules for frequently touched surfaces;
16                 and,

17           c.    Establishing policies of distancing patients who exhibit symptoms of
18                 COVID-19 from other patients in common areas."

19       92.    To comply with the Governor's directive, the Arizona Department of Health
20   Services issued R9-10-121 on March 16, 2020.[91]

21

---

22   [89]   *Id.*
     [90]   Executive Order 2020-07, *Proactive Measures to Protect Against COVID-19*, Office of the
23   Governor (Mar. 11, 2020), https://azgovernor.gov/executive-orders (last visited Feb. 18, 2021).
     [91]   *Important Notice:  Emergency Rulemaking for Disease Preventing and Control Effective*
24   *March 16,      2020,      Arizona      Department      of      Health      Services,*
     https://www.azdhs.gov/documents/director/administrative-counsel-rules/rules/rulemaking/covid-
25   19/emergencyrulemaking-diseaseprevention.pdf (last visited Feb. 18, 2021); *see also Notice of*
     *Emergency Rulemaking by the Department of Health Services*, Article R9-10-121 (New Section)
26   (Mar. 16, 2020),                      https://www.azdhs.gov/documents/director/administrative-counsel-
     rules/rules/rulemaking/covid-19/emergencyrulemaking-mar16.pdf (last visited Feb. 18, 2021).

-28-

QB\203306.00100\67212728.1

1        93.     On March 19, 2020, Governor Ducey issued an order prohibiting "all non-

2  essential or elective surgeries" until further notice effective as of March 21, 2020 (the

3  "March 19, 2020 Order").[92]  Noting that personal protective equipment (PPE) is necessary

4  for "the protection of healthcare providers" and that it was necessary to conserve PPE,

5  hospital beds and equipment, the March 19, 2020 Order barred "all non-essential or elective

6  surgeries . . . that utilize personal protective equipment or ventilators" at "any licensed

7  healthcare facility or by any licensed healthcare provider" in Arizona.

8        94.     On March 26, 2020, Governor Ducey issued an order requiring hospitals to

9  take measures to increase bed capacity by 50% and "optimize staffing levels."[93]  This order

10  further noted that "rapid implementation of hospital infection control measures" was

11  necessary "to provide adequate level of care for patients due to COVID-19."[94]

12        95.     On March 30, 2020, Governor Ducey issued a "Stay home, Stay healthy, Stay

13  connected" order restricting Arizonans from leaving their home for non-essential activities

14  (the "March 30, 2020 Order").[95]  While seeking medical care was explicitly defined as an

15  essential activity in the March 30, 2020 Order, the Order also provided that businesses that

16  remain open "shall implement social distancing and sanitation measures established by the

17  United States Department of Labor or the Arizona Department of Health Services."[96]

18        96.     The United States Department of Labor has several detailed articles detailing

19  "social distancing and sanitation measures" for employers to follow[97] and also provided

---

20   [92]  Executive Order 2020-10, *Delaying Elective Surgeries to Conserve Personal protective*

21  *Equipment Necessary to Test and Treat Patients with COVID-19*, Office of the Governor (Mar. 19, 2020), https://azgovernor.gov/executive-orders (last visited Feb. 18, 2021).

22   [93]  Executive Order 2020-16, *Increasing Hospital Capacity for COVID-19 Preparedness*, Office of the Governor (Mar. 26, 2020), https://azgovernor.gov/executive-orders (last visited Feb. 18,

23  2021).
   [94]  *Id.*

24   [95]  Executive Order 2020-18, *Stay Home, Stay Healthy, Stay Connected: Physical Distancing to Mitigate COVID-19 Transmission*, Office of the Governor (Mar. 31, 2020),

25  https://www.msn.com/en-us/news/crime/arizona-gov-ducey-issues-stay-at-home-order-for-state/ar-BB11VIBl (last visited Feb. 18, 2021).
   [96]  *Id.*

26   [97]  *Protecting Workers:  Guidance on Mitigating and Preventing the Spread of COVID-19 in the*

1     supplementary guidance specifically for healthcare workers.[98]  This guidance specifies,

2     among other things:

(a)     "Engineering Controls" including "physical barriers or partitions," and airborne infection isolation rooms meeting specified minimum ventilation standards;

(b)     "Administrative Controls" regarding patient isolation, staff protocols and training, PPE usage and CDC guidance regarding the use of signs and labeling;

(c)     "Safe Work Practices" regarding where work is performed, cleaning logistics and worker training;

(d)     "Personal Protective Equipment" detailing PPE usage procedures; and

(e)     "Cleaning and disinfection in healthcare" specifying "[r]outine cleaning and disinfection procedures . . . in healthcare settings" and providing that employers should "[f]ollow standard practice for disinfection and sterilization of medical devices contaminated with COVID-19" as described in CDC guidelines.[99]

17     97.     Pursuant to the March 30, 2020 Order, such guidance is binding on Arizona

18     employers including TMCH.

19     98.     The Arizona Department of Health Services provides "infection prevention"

20     guidance for health providers on its website.[100]  This guidance, in turn, cites the CDC's

---

[98] *Workplace*, U.S. Dep't of Labor Occupational Safety and Health Administration (January 29, 2021), https://www.osha.gov/coronavirus/safework (last visited Feb. 18, 2021); *Control and Prevention* U.S. Dep't Of Labor Occupational Safety and Health Administration, https://www.osha.gov/coronavirus/control-prevention (last visited Feb. 18, 2021).

[98] *Healthcare Workers and Employers*, U.S. Dep't of Labor Occupational Safety and Health Administration, https://www.osha.gov/coronavirus/control-prevention/healthcare-workers (last visited Feb. 18, 2021).

[99] *Id.*

[100] *COVID-19 Arizona's emergency response to the COVID-19 outbreak*, Arizona Department of Health Services, https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/index.php#novel-coronavirus-healthcare-providers (last visited Feb. 18,

-30-

1   "Infection Control Guidance" article, which details infection control practices for both

2   "routine healthcare delivery" and "when caring for a patient with suspected or confirmed

3   SARS-COV-2 infection" and "is applicable to all U.S. settings where healthcare is

4   delivered."[101]  The CDC's Infection Control Guidance includes a wide range of guidance

5   in, among others, the following categories:

6           (a)     Screening and triaging "everyone" entering a healthcare facility for

7                   signs and symptoms of COVID-19;

8           (b)     Implementing "universal source control measures" (i.e., PPE);

9           (c)     Taking steps to encourage physical distancing including alteration of

10                  seating, use of waiting rooms and other modifications;

11          (d)     [O]ptimiz(ing) the use of engineering controls and indoor air quality"

12                  via physical barriers, dedicated pathways, remote triage intake areas,

13                  and optimization or supplementation of air handling systems; and

14          (e)     Implementing "environmental infection control" including consistent

15                  use of "routine cleaning and disinfection procedures" and using an

16                  "EPA-registered, hospital grade disinfectant" on "frequently touched

17                  surfaces or objects."[102]

18      99.     Pursuant to the March 30, 2020 Order, such guidance is binding on Arizona

19   employers including TMCH.

20      100.    On April 22, 2020, Governor Ducey issued Executive Order 20-32 directing

21   the Arizona Department of Health to create a procedure for hospitals, healthcare facilities

22   and providers to request exemptions from executive order 2020-10 which barred elective

23

24   2020).
     [101] CDC,   *Infection   Control   Guidance,*   (updated   Feb.   10,   2021),
25   https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html   (last
     visited Feb. 18, 2021).
26   [102]  *Id.*

1    surgeries ("the April 22, 2020 Order").[103]  The April 22, 2020 Order set forth numerous

2    requirements for healthcare facilities seeking such an exemption including: an adequate

3    supply of PPE; operating at less than 80% bed capacity prior to such request; a "robust"

4    testing plan covering all at-risk healthcare works and each patient prior to their elective

5    procedure; and "[i]mplementation of an enhanced cleaning process for patient and waiting

6    areas."[104]  The Arizona Department of Health Services implemented the Governor's April

7    22, 2020 Order and provided additional clarification on its requirements.[105]

8        101.    TMCH applied for permission to resume elective surgeries and procedures

9    pursuant to the April 22, 2020 Order on May 1.  TMCH resumed elective procedures on

10   May 11, 2020 in a limited capacity, and resumed scheduling elective procedures at up to

11   normal capacity on May 18, 2020, subject to daily assessment of inpatient bed availability.

12   On December 19, 2020, TMCH made the decision to stop elective procedures as of

13   December 21, 2020, and began phased resumption of such procedures on January 5, 2021.

14        102.    Even after resumption of elective procedures, TMCH was forced to operate

15   under severe restrictions and with safety measures that forced TMCH to incur extra

16   expenses to prevent further physical loss of or damage to its property from the Coronavirus.

17   Among other things, TMCH has modified ventilation systems, constructed and installed

18   over 200 poly-carbonate barriers, retrofitted almost 200 rooms for negative pressure,

19   reconfigured indoor spaces, rented equipment such as tents to establish outdoor testing and

20   triage stations, purchased additional linens, adopted rigorous procedures for disinfecting

21   surfaces, added additional hand hygiene stations, incurred staffing expenses for extra

22   disinfection and temperature checks, employed an outside cleaning service for touch points

---

[103] Executive Order 2021-32, *Elective Surgeries*, Office of the Governor (Apr. 22, 2020), https://azgovernor.gov/file/34643/download?token=3F5d6Px4 (last visited at Feb. 18, 2021).
[104] *Id.*
[105] *Executive Order 2020-32 Frequently Asked Questions*, Arizona Department of Health Services (updated Nov.17, 2020), https://www.azdhs.gov/documents/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/novel-coronavirus/healthcare-providers/waiver-faq.pdf (last visited Feb. 18, 2021).

-32-

such as exterior doors and provided workers with PPE such as facemasks and gowns, at massive cost.

103.    TMCH's losses throughout its health system exceed $60 million, a staggering sum for a not-for-profit health care organization devoted to improving the health of the communities it serves.

104.    TMCH timely notified Continental of its losses and has met all conditions and requirements for coverage under the Policy.  As set forth herein, Continental has wrongly refused to provide coverage.

**F.      The "All-Risk" Commercial Property Policy and Potentially Applicable Coverages**

105.    In exchange for a very substantial premium, Continental sold TMCH the Policy, policy number 2088662743.

106.    Continental and/or its affiliate CNA, drafted the Policy, which includes the Signature Policy Form.

107.    The Policy "insures against risks of direct physical loss of or damage to property and/or interests described herein at covered *Locations*," and provides coverage for property damage losses, business interruption losses, and other losses.

108.    The Policy Limit is $750,000,000 per *Occurrence*.  The Policy Deductible is $100,000 for "[a]ll claims for loss, damage or expense covered under this policy and arising out of or resulting from any one *Occurrence*" and contains other deductibles applicable in specified circumstances.

109.    The Policy does not exclude viruses or communicable diseases as causes of loss.  Thus, the entire $750,000,000 Policy Limit is potentially available for TMCH's losses.

110.    The Policy's full terms and conditions are set forth therein, but as relevant here, the Policy provides as follows:

-33-

***Time Element Coverages, Time Element Extensions and Additional Coverages***

111.   The Policy's Time Element section includes BUSINESS INTERRUPTION (GROSS EARNINGS) coverage which "covers against loss resulting from necessary interruption of business caused by direct physical loss of or damage to covered property… by the peril(s) insured against and occurring during the term of this policy at covered ***Locations*** occupied by the Insured…."

112.   As set forth above, the Coronavirus and COVID-19 caused direct physical loss of or damage to property at TMCH's covered ***Locations***.

113.   The Coronavirus and COVID-19 also rendered such property unfit and unsafe for its normal usages, depriving TMCH of its property.

114.   Neither the Coronavirus nor COVID-19 are excluded under the Policy.

115.   Among the Policy's Time Element Coverages is the BUSINESS INTERRUPTION (GROSS EARNINGS) coverage, which covers "the actual loss sustained by the Insured resulting directly from such interruption of business… commencing with the date of such damage or destruction and not limited by the date of expiration of this policy, but in no event to exceed … [the] Business Interruption Period of Indemnity limit." The Business Interruption Period of Indemnity limit is "Twenty Four (24) Months."

116.   TMCH derives a large proportion of its revenue from the provision of elective medical surgeries and procedures. TMCH was barred from providing such care as of March 19, 2020. When healthcare providers were permitted to apply for permission to resume such procedures, TMCH did so on May 1. TMCH diligently worked to safely resume elective medical surgeries and procedures in compliance with all guidance from state and public health agencies, and was able to do so on May 11, 2020, on an initially limited basis. Even after TMC was given permission to resume elective surgeries, it could do so only at a reduced level. As such, TMCH sustained a massive Time Element loss, which is insured under the Policy.

-34-

117.   The Policy includes an EXTENDED PERIOD OF INDEMNITY, providing in relevant part: "This policy is extended to cover the loss of ***Gross Earnings*** sustained by the Insured resulting directly from the interruption of business, as covered by this policy, for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred…."

118.   The Policy provides EXTRA EXPENSE coverage, covering "the reasonable and necessary extra expense, as hereinafter defined, incurred by the Insured in order to continue as nearly as practicable the ***normal*** operation of the Insured's business following direct physical loss of or damage to covered property by perils(s) [sic] insured against." The Policy defines ***Normal*** as "The condition that would have existed had no loss occurred."

119.   As set forth herein, TMCH incurred covered Extra Expenses to resume and continue as nearly as practicable its normal business activities that would otherwise be suspended due to direct physical loss of or damage caused by the Coronavirus and COVID-19, costs associated with altering its property to protect it from physical loss of or damage, as well as the safety of its employees and patients, such as erecting barriers, altering air circulation, reconfiguring indoor spaces, disinfecting surfaces and materials, and providing PPE to employees.

120.   The Policy provides DENIAL OF ACCESS BY CIVIL AUTHORITY AND INGRESS-EGRESS coverage (as amended by endorsement) "to cover for up to the time limit … the actual loss sustained: during the period of time while access to the Insured's ***Location*** is prohibited by order of civil authority, but only when such order is given as a direct result of physical loss or damage to property of the type insured from a peril insured against occurring within five miles of said Location[.]"

-35-

1     121.   The Coronavirus and COVID-19 caused direct physical loss of or damage to

2   property throughout Tucson, Pima County and the state of Arizona, and caused the

3   deprivation of use of such property, including property within 5 miles of TMCH's

4   properties, giving rise to the actions of civil authority in Tucson, Pima County and the state

5   of Arizona, as set forth herein.  These orders prohibited access to TMCH's properties for

6   the services it normally performs.

7     122.   The Policy provides CONTINGENT BUSINESS INTERRUPTION coverage

8   "against loss to the Insured resulting from necessary interruption of business conducted by

9   the Insured at **_Locations_** occupied by the Insured and covered in this policy, caused by perils

10   insured against that result in direct physical loss or damage to any real or personal property,

11   of the type insured hereunder, owned or operated by:  direct suppliers or service providers

12   of the Insured, which wholly or partially prevents the delivery of materials, products or

13   services (other than water, communication or power supply) to the Insured or to others for

14   the account of the Insured."

15     123.   In plain English, the Policy provides coverage for TMCH's losses if the

16   properties of TMCH's direct suppliers suffer direct physical loss of or damage of a type not

17   expressly excluded under the Policy.  The Policy covers all risks of loss and does not contain

18   any relevant exclusions for TMCH's losses.

19     124.   Among other things, as set forth herein, the Coronavirus and COVID-19

20   caused direct physical loss of or damage at the properties of direct suppliers and service

21   providers to TMCH.

22     125.   Additionally, as set forth herein, the Coronavirus and COVID-19 rendered

23   such properties unfit and unsafe for their normal usages, resulting in the deprivation of use

24   of such properties.

25

26

-36-

1    ***Health Care Endorsement Coverages***

2        126.    The Policy contains a Health Care Endorsement that provides DISEASE

3    CONTAMINATION COVERAGE – PROPERTY DAMAGE AND TIME ELEMENT

4    COMBINED coverage which states:

5        If as a result of an evacuation or decontamination order at a **location** by the
         National Center for Disease Control, authorized public health official or
6        governmental authority because of the discovery or suspicion of a
7        communicable disease or the threat of the spread of a communicable disease,
         the Insurer will pay for:  (1) direct physical loss of or damage to covered
8        property; and (2) the necessary and reasonable costs incurred by the Insured
9        to:

10       a. evacuate the contaminated **location**, if required by the governmental
         authority;
11
12       b. decontaminate or dispose of contaminated covered property;

13       c. test after disposal, repair, replacement or restoration of damaged property
         is completed; and
14
15       d. pay employee overtime costs associated with providing additional care to
         patients affected by a communicable disease.
16
17       127.    The DISEASE CONTAMINATION COVERAGE – PROPERTY DAMAGE

18   AND TIME ELEMENT COMBINED coverage also provides:

19       To the extent **BUSINESS INTERRUPTION (GROSS EARNINGS)**
         coverage is applicable at that **location**, the Company will also pay, as
20       provided, for the **BUSINESS INTERRUPTION (GROSS EARNINGS)**
21       loss the Insured sustains during the Business Interruption Period of
         Indemnity… from the necessary interruption of the Insured's business due to
22       the evacuation and decontamination order at a **location** by the National Center
         for Disease Control, authorized public health official or governmental
23       authority because of the discovery or suspicion of a communicable disease or
24       the threat of the spread of a communicable disease.

25

26

-37-

128.   The DISEASE CONTAMINATION COVERAGE – PROPERTY DAMAGE AND TIME ELEMENT COMBINED coverage insured "direct physical loss of or damage" from "the discovery or suspicion of a communicable disease." This means that the presence or suspicion of communicable disease is "a peril insured against" under the Policy.

129.   Government orders discussed herein required measures to "decontaminate" TMCH's "contaminated covered property" and TMCH suffered covered loss of its gross earnings as a result of the "necessary interruption of [TMCH's] business due to" the requirements of complying with such orders. Such orders were issued "because of the discovery or suspicion of a communicable disease or the threat of the spread of a communicable disease." As a result, TMCH's costs and losses arising from such orders are covered by the Policy.

130.   The governmental orders discussed herein also required the closure of, or prohibited the occupancy of, direct suppliers of TMCH and property within 5 miles of its Hospitals. These orders also prohibited access to the medical services provide by TMCH. TMCH experienced loss of GROSS EARNINGS because of these government orders. TMCH's losses come within the terms of the DENIAL OF ACCESS BY CIVIL AUTHORITY and CONTINGENT BUSINESS INTERRUPTION coverages.

131.   No exclusions apply to TMCH's claim.

***Other Potentially Relevant Provisions***

132.   The Policy contains the Microbes Exclusion, which provides, in relevant part: "this Policy excludes loss or damage directly or indirectly caused by or resulting from: The presence, growth, proliferation, spread or any activity of ***Fungi***, wet rot, dry rot or ***Microbes***, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this policy."

133.   The Policy also provides express coverage for FUNGI, WET ROT, DRY ROT AND MICROBES (the "Microbes Coverage"), which provides, in relevant part:

-38-

This policy covers "loss or damage by *__Fungi__*, wet rot, dry rot and *__Microbes__*, when the *__Fungi__*, wet rot, dry rot and *__Microbes__* are the result of covered physical loss, damage or destruction of property insured by this policy, but only if;

(1) The Covered Cause of Loss from which the *__Fungi__*, wet rot, dry rot and *__Microbes__* loss or damage resulted occurred during this policy period;

(2) All reasonable means were used to save and preserve the property from further damage at the time of and after that *__Occurrence__*; and

(3) The existence of the *__Fungi__*, wet rot, dry rot and *__Microbes__* loss or damage is reported as soon as practicable, but no later than 180 days after the *__Occurrence__* of the Covered Cause of Loss from which the *__Fungi__*, wet rot, dry rot and *__Microbes__* loss or damage resulted.

134.     The Policy defines *__Microbes__* as "[a]ny non-fungal microorganism or non-fungal, colony-form organism that causes infection or disease.  *__Microbe__* includes any spores, mycotoxins, odors, or any other substances, products or byproducts produced by, released by, or arising out of the current or past presence of microbes."

135.     Thus, the Policy defines *__Microbes__* as certain limited types of "microorganism" – and the term "microorganism" refers exclusively to microscopic living organisms (for example, bacteria).

136.     Viruses such as the Coronavirus and COVID-19 are not living organisms.  As such, neither the Microbes Coverage nor the Microbes Exclusion apply to TMCH's claims herein. TMCH also expects that additional coverages under the Policy may become relevant and applicable when the calculation of its full losses is fully known.  The foregoing is not a comprehensive discussion of all potentially applicable Policy coverages, terms, and conditions, which are fully set forth in the Policy..

### *History of the Microbe Policy Language*

137.     *After* Continental issued the Policy and *after* the prevalence and severity of the Coronavirus and COVID-19 became widely known, Continental sought and obtained

QB\203306.00100\67212728.1

1    permission to insert the word "virus" into the definition of the term ***Microbe*** as used in its

2    Signature Policy Form in Oklahoma property insurance policies.[106]

3        138.   On information and belief, after Continental issued the Policy, Continental,

4    CNA or their affiliates, requested permission to insert the word "virus" into the definition

5    of the term ***Microbe*** as used in its Signature Policy Form for property insurance policies in

6    multiple states.

7        139.   On information and belief, after Continental issued the Policy, Continental,

8    CNA or their affiliates requested permission to insert the word "virus" into the definition

9    of the term ***Microbe*** as used in its Signature Policy Form for property insurance policies in

10   every state where Continental, CNA or their affiliates could make such a change to the

11   Signature Policy Form without prior regulatory approval.

12       140.   On information and belief, after Continental issued the Policy, Continental,

13   CNA or their affiliates issued property insurance policies on the Signature Policy Form in

14   which the word "virus" was included within the definition of the term ***Microbe***.

15       141.   On information and belief, after Continental issued the Policy, Continental,

16   CNA or their affiliates issued property insurance policies on the Signature Policy Form in

17   Arizona in which the word "virus" was included in the definition of the term ***Microbe***.

18       142.   After Continental issued the Policy, and after the prevalence and severity of

19   the Coronavirus and COVID-19 became widely known, Continental sought and obtained

20   permission to include a Communicable Disease Exclusion Endorsement excluding

21   "viruses" from certain coverages provided by the Signature Policy Form in Oklahoma

22   property insurance policies.

23       143.   On information and belief, after Continental issued the Policy, Continental,

24   CNA or their affiliates, requested permission to include a Communicable Disease Exclusion

25

26   _____

[106]   *See* Exhibit 2.

-40-

1    Endorsement excluding "viruses" from certain coverages provided by the Signature Policy
2    Form for property insurance policies in multiple states.

3         144.    On information and belief, after Continental issued the Policy, Continental,
4    CNA or their affiliates, requested permission to include a Communicable Disease Exclusion
5    Endorsement excluding "viruses" from certain coverages provided in the Signature Policy
6    Form for property insurance policies in every state where Continental, CNA or their
7    affiliates could make such a change to the Signature Policy Form without prior regulatory
8    approval.

9         145.    On information and belief, after Continental issued the Policy, Continental,
10   CNA or their affiliates issued property insurance policies on the Signature Policy Form
11   containing a Communicable Disease Exclusion Endorsement.

12        146.    On information and belief, after Continental issued the Policy, Continental,
13   CNA or their affiliates issued property insurance policies on the Signature Policy Form in
14   Arizona containing a Communicable Disease Exclusion Endorsement.

15        147.    As detailed below, one of CNA's other property insurance forms, the CNA
16   Paramount form, demonstrates that CNA and Continental are fully aware that viruses are
17   not microbes.

18        148.    The CNA Paramount forms also includes the Microbes Coverage, Microbes
19   Exclusion, and a definition of Microbe.

20        149.    The CNA Paramount form defines Microbe as "any: A. non-fungal
21   microorganism; B. non-fungal, colony-form organism; C. virus; or D. bacteria. ***Microbe***
22   includes any spores, mycotoxins, odors, or any other substances, products, or byproducts
23   produced by, released by, or arising out of the current or past presence of microbes."

24        150.    CNA's explicit inclusion of the term "virus" in the definition of Microbe in
25   the CNA Paramount forms demonstrates CNA's acknowledgment that viruses are not
26   microbes.

-41-

1    151.   If Continental wanted to exclude coverage for loss arising from or related to

2    virus in the Policy, it could have used the same definition of ***Microbe*** that CNA uses in the

3    CNA Paramount forms, and that CNA obtained permission to use in its Signature Policy

4    Form after Continental issued the Policy.

5    **G.    Continental Denies TMCH's Claim**

6    152.   On or about May 5, 2020, TMCH gave notice to Continental of its losses from

7    the Coronavirus and COVID-19 ("TMCH's Claim").

8    153.   Continental never sent an adjuster – or anyone on its behalf – to visit, inspect

9    or set foot in any TMCH locations or properties to investigate TMCH's Claim.

10    154.   Other than exchanging certain emails with TMCH requesting limited

11    information and a single telephonic conversation, Continental has not conducted any

12    investigation of TMCH's Claim.

13    155.   On June 18, 2020, Continental issued a coverage letter denying any coverage

14    for TMCH's Claim under the Policy.

15    156.   On August 12, 2020, Continental issued a second coverage letter again

16    denying coverage for TMCH's Claim under the Policy.

17    157.   Among other things, Continental asserted in its June 18, 2020 letter that

18    "TMCH has not reported any 'direct physical loss of or damage to' to the properties for

19    which TMCH has submitted claims" – ignoring the mounting evidence to the contrary, and

20    mischaracterizing the applicable policy language.

21    158.   Upon information and belief, Continental also contends that its promise to

22    pay for loss resulting from, "physical loss of or damage" to qualifying property is strictly

23    limited to property that undergoes a tangible, permanent alteration or transformation as a

24    result of an external force, as might be the case when a fire burns a piece of wood.  But the

25    coverage provided under the Policy is not so narrowly circumscribed; its coverage expressly

26

-42-

QB\203306.00100\67212728.1

1   extends to all "risks of direct physical loss of or damage" unless excluded, including the
2   inability to access or use all or a portion of the insured premises.

3      159.   The requirement of "physical loss of or damage" to property has been met in
4   one or more ways as alleged herein, including by virtue of the "physical loss of or damage"
5   to TMCH's qualifying property caused by (i) the actual or potential presence of the
6   Coronavirus in the air (whether in droplet nuclei, aerosols, droplets, or otherwise) and on
7   surfaces such as door handles, bed railings and medical equipment at such properties; (ii)
8   the necessity of modifying physical behaviors through the use of social distancing in order
9   to reduce or minimize the potential for viral transmission, as well as the necessity of
10  physically modifying interior spaces; (iii) government orders requiring that physical spaces,
11  be shut down, or restricting the use of such physical spaces, as was the case with the
12  prohibition on elective surgeries and procedures; and/or (iv) the need to mitigate the threat
13  or actual physical presence of the Coronavirus on door handles, bedsheets, hospital gowns,
14  bed railings, medical equipment, and assorted surfaces, as well as in heating and air
15  conditioning systems and any other of the multitude of places virus has or could be found.

16     160.   CNA's own guidance documents demonstrates that the Coronavirus and
17  COVID-19 cause property damage.  In written documentation to its policyholders, CNA
18  noted the "unprecedented complexities" employers face as they begin to recall employees,
19  and stressed the importance of cleaning and disinfecting the workplace to mitigate COVID-
20  19 exposures:

21      Using EPA-registered disinfectants, perform an initial preventative
22      decontamination of workspaces, including all high touch surfaces such as
        desks, tables, chairs, door knobs, light switches, handles and toilets.  Also
23      clean and disinfect shared equipment, such as phones, pens, keyboards,
24      touchscreens and remote controls. . . .  To further mitigate exposure,
        determine a workable schedule for ongoing environmental cleaning and
25      disinfection, especially of highly trafficked areas and services.[107]

26  ───────────────────
    [107]  *COVID-19     Returning     to     Work     Prep     Guide*,     CNA,

-43-

161.   CNA further noted the importance of "engineering controls" such as air filtration and use of partitions, modifying the workplace for social distancing and other measures.[108] CNA also stressed that it was also necessary to consult with OSHA, CDC and state and local health department requirements.[109]

162.   Continental leaped to the conclusion to deny coverage despite never visiting or sending an adjuster to any TMCH properties to verify the accuracy of its position, and despite CNA's website postings about the physical nature of the Coronavirus and how "environmental cleaning and disinfection" of surfaces can "mitigate exposure" to the Coronavirus – postings that remain on CNA's website even today.

163.   Continental also disputed that the governmental orders were issued "as a result of direct physical loss of or damage to property" for the purposes of DENIAL OF ACCESS BY CIVIL AUTHORITY AND INGRESS-EGRESS coverage – ignoring the context of the relevant orders, and the science regarding the transmission of COVID-19, discussed herein.

164.   Continental also disputed that the numerous governmental orders cited herein are "evacuation or decontamination order[s]" within the meaning of the DISEASE CONTAMINATION COVERAGE – PROPERTY DAMAGE AND TIME ELEMENT COMBINED coverage.  Continental's position flies in the face of the plain language of the governmental orders requiring extensive measures to disinfect, sanitize and sterilize surfaces contaminated by the Coronavirus and COVID-19.

165.   Continental also alleged that "there was no partial or total closure of your facilities" due to disease contamination, which is contradicted by the March 19, 2020 Order which restricted TMCH's use of its property by prohibiting elective surgeries and

https://www.cna.com/web/wcm/connect/7ae06982-cdb5-4593-9c14-77754cf6efd0/RC-COVID-19-Returning-to-Work-Guide.pdf?MOD=AJPERES (last visited Feb. 18, 2021).
[108]   *Id.*
[109]   *Id.*

-44-

1    procedures. Continental's August 12, 2020 letter further contends that "even if physical

2    damage was found at or around a location, TMCH's tenants' operations were not reduced

3    because of that damage, but instead . . . reduced to comply with the governor's Order."

4    Continental's position both invents a new requirement which is not contained within the

5    Policy, and ignores the context of the Governor's March 19, 2020 Order.

6        166.   Continental cited additional coverage exclusions that do not apply to TMCH's

7    losses.

8        167.   Continental's denial of TMCH's Claim without conducting a substantive

9    investigation of such claim constitutes a breach of the duty of good faith and fair dealing an

10   insurer owes to its insured. In so doing, Continental placed its own interests above those of

11   its policyholder.

12       168.   Finally, while denying all coverage for TMCH's Claim, Continental has

13   refused TMCH's request to extend the one-year deadline under the Policy for TMCH to file

14   a coverage action, thus forcing TMCH to bring the instant action to preserve its coverage

15   rights.

16                          **FIRST CLAIM FOR RELIEF**
                          **(Declaratory Judgment)**

17

18       169.   TMCH incorporates the above Paragraphs by reference.

19       170.   This is a claim for relief for declaratory judgment pursuant to Ariz. R. Civ. P.

20   57 and Ariz. Rev. Stat. §12-1831. An actual and justiciable controversy exists between

21   TMCH and Continental concerning their respective rights and obligations under the Policy.

22       171.   The issuance of declaratory relief will terminate the controversy between

23   TMCH and Continental that gave rise to this action.

24       172.   As such, this Court has the authority to issue a declaratory judgment

25   concerning the respective rights and obligations of TMCH and Continental under the Policy.

26

-45-

1      173.   TMCH seeks a declaratory judgment declaring that the Policy covers the

2  losses it has suffered.

3      174.   TMCH seeks a declaratory judgment declaring that Continental is responsible

4  for fully and timely paying TMCH's Claim.

5      175.   The burden of proof is upon Continental to demonstrate that coverage is

6  limited in any way under the Policy.

7                                    **SECOND CLAIM FOR RELIEF**

8                                    **(Breach of Contract)**

9      176.   TMCH incorporates the above Paragraphs by reference.

10     177.   The Policy is a valid and enforceable contract.

11     178.   TMCH paid substantial premiums for the Policy and the promises of coverage

12  contained therein, and otherwise performed all of its obligations owed under the Policy or

13  was excused from performance.

14     179.   TMCH has denied TMCH's claims and has refused to pay or otherwise honor

15  its promises.   In denying coverage for TMCH's insurance claim as alleged above,

16  Continental breached the contract (that is, the Policy). As a result, TMCH has suffered and

17  continues to suffer damage in an amount to be proven at trial, but currently estimated to

18  exceed $60 million.

19     180.   By failing to investigate TMCH's Claim, Continental breached its duty of

20  good faith and fair dealing to its insured. As a result, TMCH is entitled to consequential

21  damages for Continental's breach of the Policy.

22     181.   Consequential damages for breach of the Policy were reasonably

23  contemplated by the parties when Continental issued the Policy.

24

25

26

1

**PRAYER FOR RELIEF**

Wherefore, TMCH respectfully requests that the Court enter Judgment in its favor against Defendant as follows:

A.   On the First Cause of Action, a declaratory judgment that the losses TMCH has suffered are covered by the Policy and that Continental is responsible for fully and timely paying TMCH's losses;

B.   On the Second Cause of Action, for an award of damages in favor of TMCH in an amount to be proven at trial, plus pre- and post-judgment interest at the maximum legal rate, attorneys' fees, costs and disbursements for this action; and

C.   Such other equitable and further relief as this Court deems just and proper.

**JURY DEMAND**

TMCH hereby demands a trial by jury on all issues so triable in this action.


DATED this 26th day of February, 2021.

> QUARLES & BRADY LLP
> One South Church Avenue
> Suite 1800
> Tucson, Arizona 85701
> *Attorneys for Plaintiff TMC HealthCare*
>
>
> By */s/ Luis A. Ochoa*
> Luis A. Ochoa

-47-

QB\203306.00100\67212728.1

# Exhibit 1

| CNA-- Property Policy |
| --- |

## THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY

It is hereby understood and agreed that the policy to which this endorsement is attached is amended as follows:

Effective January 1, 2020 the following location is added to the Statement of Values on file with company;

    450 S Ocotillo Avenue, Benson, AZ 85602
    Building value: $7,869,908; Content value: $3,947,868; Business Income value: $5,647,492

    500 S Highway 80, Benson, AZ 85602
    Building value: $75,695; Content value: $37,282; Business Income value: $Included

    688 W 4th Street, Benson, AZ 85602
    Building value: $51,398; Content value: $25,316; Business Income value: $Included

    Total Building value: $7,997,000; Total Content value: $4,010,466;
    Total Business Income value: 5,647,492

The additional premium due to this change will be $13,206

The above premium includes the following amount for Terrorism coverage: $153

All other terms and conditions remain unchanged.

THIS ENDORSEMENT IS A PART OF YOUR POLICY AND TAKES EFFECT ON THE EFFECTIVE DATE OF YOUR POLICY UNLESS ANOTHER EFFECTIVE DATE IS SHOWN BELOW

| POLICY CHANGE | | POLICY NUMBER |
| --- | --- | --- |
| #13 | | RMP 2098249422 |
| NAMED INSURED | POLICY PERIOD | EFFECTIVE DATE |
| TMC Healthcare | 10/01/2019 to 10/01/2020 | January 1, 2020 |

G-56015-B



**CNA Property Policy**

**Policyholder Notice - Commercial Risk Exempt Notice**

# IMPORTANT INFORMATION

## COMMERCIAL EXEMPT RISK

**Notice to Arizona Industrial Insured Policyholders**

> **Pursuant to Arizona Revised Statutes Section 20-400.10, this policy and the rates charged for it have not been filed with or approved by the Director of the Arizona Department of Insurance. Certain provisions of Arizona law, specified in Arizona Revised Statutes Section 20-400.10, do not apply to this policy. If the insurer that issued this policy becomes insolvent, insureds or claimants will not be eligible for Insurance Guaranty Fund protection pursuant to Arizona Revised Statutes Title 20.**

*Notice to Colorado Exempt Commercial Policyholders*

> **This policy is exempt from the rate filing and approval and the form filing and certification requirements of the division of insurance.**

*Notice to District of Columbia Exempt Commercial Risk Policyholders*

> NOTICE: This policy is issued to an exempt commercial risk. The rate and policy form are not subject to the filing, review, and approval requirements of the Commissioner.

*Notice to Georgia Large Commercial Risk Policyholders*

> The rates, rating plans or resulting premiums provided for in this policy are exempt from the filing and approval requirements of the Office of Commissioner of Insurance.

*Notice to Kentucky Exempt Commercial Policyholders*

> The rate provided for in this policy is exempt from the filing and approval requirements of Kentucky Revised Statutes Chapter 342.

*Notice to Maine Large Commercial Policyholders*

> The contract provisions, rates and rating plans provided for in this policy are exempt from the filing and approval requirements of the Bureau of Insurance.

*Notice to Michigan Large Commercial Policyholders*

> This policy is exempt from the filing requirements of section 2236 of the insurance code of 1956, 1956 PA 218, MCL 500.2236.

*Notice to Missouri Large Commercial Policyholders*

> This Policy may include rates and forms exempt from filing requirements with the Missouri Department of Insurance, Financial Institutions and Professional Registration.

***Notice to New Hampshire Large Scale Commercial Insured Policyholders***

> **The policy applied for, including the rates, rating plans, resulting premiums, and the policy forms, are not subject to New Hampshire rate and form requirements and other provisions of the insurance law that apply to other commercial products and may contain significant differences from a policy that is subject to all insurance law provisions.**

*Notice to Pennsylvania Large Commercial Risk Policyholders*

> The form of, and rates provided for in, this policy are exempt from the filing and approval requirements of the Pennsylvania Department of Insurance.

*Notice to Rhode Island Commercial Special Risk Policyholders*

> The form of, and rates provided for in, this policy are exempt from the filing and approval requirements of the Rhode Island Department of Insurance.

*Notice to Tennessee Commercial Special Risk Policyholders*

> The rate provided for in this policy and all forms utilized are exempt from the filing requirements of the Tenn. Code Ann. section 56-5-106.

G145707F (12-18)    Copyright CNA All Rights Reserved.    Page 1 of 1



**CNA Property Policy**

**Policy Holder Notice - Countrywide**

# IMPORTANT INFORMATION

## REQUEST FOR JURISDICTIONAL
## INSPECTION OF PRESSURE EQUIPMENT

Many states and some cities issue certificates permitting the continued operation of certain equipment such as boilers, water heaters and pressure vessels. Periodic inspections are required to renew these certificates. In most jurisdictions, as part of an equipment breakdown policy, insurance company employees who have been licensed are authorized to perform these inspections.

**If:**

- You own/operate pressure equipment that requires a certificate from a state, county, city or parish to operate legally, and

- We insure that equipment under this Policy, and

- You would like CNA to perform the next required inspection:

**Then:**

Complete the form on page 2 and email, mail or fax as instructed:

> ### No need to call or respond if you do not have boilers or pressure vessels that require operating certificates.

**BY EMAIL** :     EBinspections@cna.com (please scan the completed form and attach)

**BY MAIL** :                                                                              **BY FAX** : 609-524-3649
CNA Equipment Breakdown Risk Control
184 Liberty Corner Road
4th Floor, Suite 402
Warren, NJ 07059                                        **BY PHONE** : call 866-262-0540 – press "4"

Questions or inquiries can be made via any of the above methods of communication.

**Please note the following** :

- Your jurisdiction(s) may charge you a fee for renewing a certificate. It is your responsibility to pay such a fee.

- If CNA is required to pay the fee on your behalf, CNA will invoice you to recover that fee.

- All the provisions of the INSPECTION AND SURVEYS condition apply to the inspections described in this notice.

**Failure to notify us can result in fines and penalties being issued to the equipment owner by the governing jurisdiction. CNA is not responsible for said fines or penalties.**

### REMINDER

If new equipment is installed or old equipment replaced that requires a jurisdictional inspection, please let us know by transmitting the new information to the postal address/fax number/email address listed above and on the following page.

If this is a renewal and information (locations) has not changed, please disregard this notice.

If inspection and maintenance are outside of your area of responsibility, we would appreciate your forwarding this notice to the appropriate person. **If no response is received, we are assuming there are no jurisdictional objects at your location(s) and no inspections are required.**

**Note: Jurisdictional inspections are not conducted outside of the United States, its territories, possessions, or Canada.**



**CNA Property Policy**

**Policy Holder Notice - Countrywide**

## REQUEST FOR JURISDICTIONAL INSPECTION

| **Insured Name:** TMC HEALTHCARE |
|---|
| **Facility/Location Name:** |

| **Policy Number:** 2088662743 | **Policy Term:** October 1, 2019  October 1, 2020 |
|---|---|

| **Contact Person & Title:** | |
|---|---|
| **Contact Phone Number(s)—Office:** | **Cell:** |
| **Contact Email Address:** | |

| Location Address[1] | City | State | Zip |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |

| Equipment Type[2,3,4] (Boiler, Pressure Vessel) | Registration Number (State #) | Certificate Expiration Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**Completed By (Name & Date):** _____

**Telephone #/Email Address:** _____

**BY EMAIL:**  EBinspections@cna.com (please scan the completed form and attach)

**BY MAIL:**                                                    **BY FAX:** 609-524-3649

CNA Equipment Breakdown Risk Control
184 Liberty Corner Road
4th Floor, Suite 402
Warren, NJ 07059                    **BY PHONE:** call 866-262-0540 – press "4"

[1]If multiple objects and/or multiple locations, please list all required information on separate page(s).

[2]Boiler is defined as an enclosed vessel heated by fuel or electricity to produce steam or hot water.

[3]Pressure Vessel is defined as an enclosed vessel (tank) greater than 6 cubic feet (18 inches x 40 inches) to store liquid or gas under pressure for use when needed.

[4]LPG (ex: propane, propylene, butane & butylenes) Tank with vapor pressures not exceeding that allowed for commercial propane. California requirement only.



**CNA Property Policy**

**Policy Holder Notice - Large Property Claims Reporting**

All new property claims under CNA Large Property policies should be reported to our centralized Loss Processing Center. Claims will be assigned to our specialized technical staff or to one of our preferred service providers.

**FOR EMERGENCY CONTACT:**

- Our 24-hour toll free number for direct contact with the CNA Loss Processing Center is:

  877-261-6676

**FOR NON-EMERGENCY:**

- Property claims may be reported by toll free <u>fax</u> to the CNA Loss Processing Center at:

  877-566-2728

- Property claims may also be reported via <u>email</u> to the CNA Loss Processing Center at:

  CNAproperty.LPC@cna.com

Claims reported by fax or email are processed during normal business hours. If your claim is an emergency requiring after hours contact with an adjuster, call the 24-hour toll free number.

Copyright CNA All Rights Reserved.



# IMPORTANT INFORMATION

## NOTICE – OFFER OF TERRORISM COVERAGE; DISCLOSURE OF PREMIUM

**THIS NOTICE DOES NOT FORM A PART OF THE POLICY, GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

As used herein, 1) "we" means the insurer listed on the Declarations or the Certificate of Insurance, as applicable; and 2) "you" means the first person or entity named on the Declarations or the Certificate of Insurance, as applicable.

You are hereby notified that under the Terrorism Risk Insurance Act, as extended and reauthorized ("Act"), you have a right to purchase insurance coverage of losses arising out of acts of terrorism, as defined in Section 102(1) of the Act, subject to all applicable policy provisions. The Terrorism Risk Insurance Act established a federal program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks.

This Notice is designed to alert you to coverage restrictions and to certain terrorism provisions in the policy. If there is any conflict between this Notice and the policy (including its endorsements), the provisions of the policy (including its endorsements) apply.

CHANGE IN THE DEFINITION OF A CERTIFIED ACT OF TERRORISM

The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. Originally, the Act provided that to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States. However, the 2007 re-authorization of the Act removed the requirement that the act of terrorism must be committed by or on behalf of a foreign interest, and now certified acts of terrorism may encompass, for example, a terrorist act committed against the United States government by a United States citizen, when the act is determined by the federal government to be "a certified act of terrorism."

In accordance with the Act, we are required to offer you the ability to purchase coverage for losses resulting from an act of terrorism that is certified under the federal program. The other provisions of this policy, including nuclear, war or military action exclusions, will still apply to such an act.

DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The Department of the Treasury will pay a share of terrorism losses insured under the federal program. In 2015, the federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention, and shall decrease by 1 percentage point per calendar year until equal to 80%.

LIMITATION ON PAYMENT OF TERRORISM LOSSES

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

Further, this coverage is subject to a limit on our liability pursuant to the federal law where, if aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year (January 1 through December 31) and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

CONFIRMATION OF ACCEPTANCE OF COVERAGE

In accordance with the Act, we offered you coverage for losses resulting from an act of terrorism that is certified under the federal program. This notice confirms that you have chosen to accept our offer of coverage for certified acts of terrorism. The policy's other provisions, including nuclear, war or military action exclusions, will still apply to such an act. The premium charge for terrorism coverage, if any, is shown separately on the Declarations or the Certificate of Insurance, as applicable.

 Copyright CNA All Rights Reserved.

|  | | **CNA Property Policy** |
|---|---|---|
| | | **Policy Declarations** |

CNA Insurance
151 N. Franklin St.
Chicago, IL 60606

| Branch | Producer Number | Prefix | Policy Number |
|---|---|---|---|
| 630 | 502473 | RMP | 2088662743 |

| NAMED INSURED & ADDRESS: | INSURANCE IS PROVIDED BY THE COMPANY DESIGNATED BELOW (A stock insurance company, herein called the company) |
|---|---|
| TMC HEALTHCARE<br>5301 E GRANT ROAD<br>TUCSON, AZ 85712 | CONTINENTAL CASUALTY COMPANY |
| NAMED INSURED IS: Corporation | |

Policy Period: From October 1, 2019 to October 1, 2020

This policy becomes effective and expires at 12:01 a.m. Standard Time at Your Mailing Address Shown Above.

---

**In Return For The Payment Of The Premium, And Subject To All The Terms Contained Herein, the Company Agrees With the Named Insured To Provide The Insurance As Stated.**

☐ "X" if Supplemental Declarations is attached

| **DESCRIPTION OF PREMISES** |
|---|

**Per CNA SIGNATURE Property Policy**

| **COVERAGES PROVIDED** – INSURANCE AT THE DESCRIBED PREMISES APPLIES ONLY FOR COVERAGES FOR WHICH A LIMIT IS SHOWN |
|---|

**Per CNA SIGNATURE Property Policy**

| **OPTIONAL COVERAGES** – APPLICABLE ONLY WHEN ENTRIES ARE MADE IN THE SCHEDULE BELOW |
|---|

**Per CNA SIGNATURE Property Policy**

| **MORTGAGE HOLDER(S)** |
|---|

**Per CNA SIGNATURE Property Policy**

| **DEDUCTIBLE** |
|---|

**Per CNA SIGNATURE Property Policy**

| **FORMS AND ENDORSEMENTS APPLICABLE AT TIME OF ISSUANCE:** |
|---|

APPLICABLE TO ALL COVERAGES: SEE ATTACHED SCHEDULE OF FORMS AND ENDORSEMENTS.

Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Policy Declarations**

| | |
|---|---:|
| **TOTAL PREMIUM PAYABLE AT INCEPTION:** | **$302,641.00** |
| Premium includes the following amount for Terrorism coverage: | $3,500.00 |
| Total amount payable includes Taxes/Surcharges of: | None |

IN WITNESS WHEREOF, the Company has caused this Policy to be signed by its Chairman and Secretary.

Chairman of the Board                      Secretary

Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Policy Declarations**

## SCHEDULE OF FORMS AND ENDORSEMENTS

Forms and endorsements attached to this Policy at inception are as follows:

| FORM NAME | FORM NUMBER | FORM EDITION DATE |
|---|---|---|
| Policy Declarations | G55161E | (01-17) |
| CNA Signature Property Policy | G300709A | (10-08) |
| Equipment Breakdown Coverage | G300710A | (10-08) |
| Decontamination Expense Endorsement | CNA71240XX | (10-12) |
| Denial Of Access By Civil Authority Endorsement | CNA71246XX | (10-12) |
| Flood Limit Endorsement | CNA71243XX | (10-12) |
| Newly Acquired or Constructed Property Endorsement | CNA71242XX | (10-12) |
| Personal Property of Patients or Residents Endorsement | CNA67589XX | (04-18) |
| Vacancy Building Description Endorsement | G56015B | (10-19) |
| Contingent Business Interruption Revisions Endorsement | G301199A | (10-11) |
| Earth Movement & Loss Conditions Amendatory Endorsement | G300981B | (03-18) |
| Cancellation Changes | CNA79809XX | (08-14) |
| Healthcare Endorsement | G300789B | (03-19) |
| Locks and Keys Endorsement | CNA71096XX | (10-12) |
| Terrorism Coverage Under TRIA Endorsement | G300714A | (10-08) |

Copyright CNA All Rights Reserved.



# CNA Property Policy

# Signature Policy Form

## SCHEDULE OF SECTIONS INCLUDED

**SECTIONS**  **PAGE NO.**

**SECTION I. DECLARATIONS**  **4**

    1.   Named Insured and Mailing Address  4

    2.   Term  4

    3.   Territorial Limits  4

    4.   Limits of Liability  4

    5.   Time Limits  7

    6.   Deductible(s)  7

**SECTION II. COVERAGE**  **10**

**A.  Property**  **10**

    1.   Covered Property and Related Interests  10

    2.   Property Not Covered  10

**B.  Time Element**  **11**

    1.   Business Interuption (Gross Earnings)  11

**C.  Additional Coverages, Coverage Extensions and Limitations**  **12**

    1.   Accounts Receivable  12

    2.   Arson and Crime Reward  13

    3.   Brand or Trademark Removal  13

    4.   Contigent Business Interruption (Gross Earnings)  13

    5.   Contract Penalties  13

    6.   Debris Removal  13

    7.   Decontamination Expense  13

    8.   Defense Costs  14

    9.   Deferred Payments  14

    10.  Denial of Access by Civil Authority and Ingress-Egress  14

    11.  Electronic Data Processing  14

    12.  Expediting Expenses  15

    13.  Expenses Related to Reducing Loss  15

    14.  Extended Period of Indemnity  15

    15.  Extra Expense  15

    16.  Fine Arts  16

    17.  Fire Brigade Charges and Extinguishing Expenses  16

    18.  Fungi, Wet Rot, Dry Rot and Microbes  16

    19.  Leasehold Interest  17

    20.  Loss Adjustment Expense  17

    21.  Machinery/Pair And Set  17



**CNA Property Policy**

**Signature Policy Form**

### SCHEDULE OF SECTIONS INCLUDED

**SECTIONS**                                                 **PAGE NO.**

| | | Page |
|---|---|---|
| | 22. Newly Acquired or Constructed Property | 17 |
| | 23. Ordinance or Law, Demolition Cost, and Increased Cost of Construction | 18 |
| | 24. Pollution Clean Up and Removal | 18 |
| | 25. Preservation of Property | 19 |
| | 26. Professional Fees | 19 |
| | 27. Property in the Course of Construction – Soft Costs | 19 |
| | 28. Property Off Premises | 19 |
| | 29. Radioactive Contamination | 19 |
| | 30. Rental Value | 20 |
| | 31. Research and Development Expenses | 20 |
| | 32. Royalties | 20 |
| | 33. Service Interruption | 20 |
| | 34. Transit | 21 |
| | 35. Trees, Shrubs, Plants and Land Improvements | 21 |
| | 36. Unintentional Errors and Omissions | 21 |
| | 37. Unscheduled Locations | 21 |
| | 38. Valuable Papers & Records | 22 |
| **D.** | **Exclusions** | **22** |
| | 1. Group 1. Exclusions | 22 |
| | 2. Group 2. Exclusions | 24 |
| | 3. Time Element Exclusions | 25 |
| **SECTION III.** | **GENERAL CONDITIONS** | **25** |
| | 1. Abandonment | 25 |
| | 2. Access to Books and Records | 25 |
| | 3. Assignment of the Policy | 25 |
| | 4. Cancellation | 25 |
| | 5. Certificates of Insurance | 26 |
| | 6. Concealment, Misrepresentation or Fraud | 26 |
| | 7. Conformance with State Statutes | 26 |
| | 8. Contributing Insurance | 26 |
| | 9. Currency | 26 |
| | 10. Divisible Contract Clause | 26 |
| | 11. Economic and Trade Sanctions | 26 |
| | 12. Excess Insurance | 27 |
| | 13. Inspections | 27 |

       Copyright CNA All Rights Reserved.       



**CNA Property Policy**

**Signature Policy Form**

### SCHEDULE OF SECTIONS INCLUDED

**SECTIONS**                                                                                  **PAGE NO.**

14. Impairment of Recovery Rights for Property in Transit ................ 27
15. Loss Payable Clause ................ 27
16. Mortgagee Interests and Obligations ................ 27
17. No Benefit to Bailee ................ 28
18. Other Insurance ................ 28
19. Reinstatement ................ 28
20. Subrogation ................ 28
21. Time ................ 29
22. Titles of Paragraphs ................ 29

**SECTION IV. LOSS CONDITIONS** ................ **29**

1. Appraisal ................ 29
2. Assistance and Cooperation of the Insured ................ 29
3. Claims Against Carrier ................ 30
4. Duties after a Loss ................ 30
5. Experience of the Business ................ 30
6. Partial Payment of Loss ................ 31
7. Payment of Loss ................ 31
8. Resumption of Operations ................ 31
9. Suit Against the Insurers ................ 31
10. Salvage and Recoveries ................ 31
11. Vacancy ................ 31
12. Valuation ................ 32

**GLOSSARY** ................ **34**

**EQUIPMENT BREAKDOWN COVERAGE** ................ **Attachment**

Copyright CNA All Rights Reserved.



| | **CNA Property Policy** |
| --- | --- |
| | **Signature Policy Form** |

(All words or terms in ***bold, italic, underlined*** format are defined in the Glossary at the end of this policy)

| **I.** | **DECLARATIONS** |
| --- | --- |

**1.    NAMED INSURED and MAILING ADDRESS**

**TMC HEALTHCARE
5301 E GRANT ROAD
TUCSON, AZ 85712**

and its ***Affiliated or Subsidiary Organizations*** as of the date hereof.

The word "Insured" shall include as Named Insured any organization which is acquired or formed by the Insured and over which the Insured maintains an interest of more than fifty percent (50%) (other than a joint venture), provided that the Company is promptly notified of the acquisition or the formation within ninety (90) days after such organization is acquired or formed by the Insured. However, any such organization which is acquired by the Insured and over which the Insured maintains an interest of more than fifty percent (50%) shall only be covered from the effective date of such acquisition or formation.

**2.    TERM**

This insurance shall attach on **October 1, 2019** and cover continuously thereafter until **October 1, 2020** at 12:01 AM Local Standard Time at the mailing address shown above or for such further period as may be agreed upon in writing.

**3.    TERRITORIAL LIMITS**

The coverage territory is The United States of America, including its territories and possessions, and Canada.

**4.    LIMITS OF LIABILITY**

**POLICY LIMITS:   $750,000,000**

Blanket all coverages for the schedule of locations and values dated 08/07/2019 attached to this policy or on file with the Company, subject to a maximum limit any one occurrence of: $750,000,000

**And further subject to the individual sublimits stated below.**

**These sublimits are part of and not in addition to the above-stated POLICY LIMITS, the Property sublimits and the Business Interruption sublimits.**

Coverage hereunder applies up to, but not more than, the stated limits per ***Occurrence***, except where an ***Annual Aggregate*** is stated. Coverage attaches only to those items for which a dollar amount or "INCLUDED" is shown. "INCLUDED" means the coverage does not have a separate sublimit and is included within the applicable sublimits as shown above. See Section II. **COVERAGE** for description of items.

| | | |
| --- | --- | --- |
| a. | Accounts receivable: | $10,000,000 |
| b. | Arson and Crime Reward: | $100,000 |
| c. | Brand or Trademark Removal: | $1,000,000 |
| d. | Contingent Business Interruption (Gross Earnings): | |
| | • Scheduled dependent property: | NOT COVERED |
| | • Unscheduled dependent property within **TERRITORIAL LIMITS**: | $5,000,000 |
| e. | Contract Penalties: | $250,000 |
| f. | Debris Removal: | $15,000,000 |

Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

| | | | |
|---|---|---|---|
| g. | Decontamination Expense: | | $1,000,000 |
| h. | Defense Costs: | | $100,000 |
| i. | Deferred Payments: | | $1,000,000 |
| j. | Denial of Access by Civil Authority / Ingress – Egress: | | $10,000,000 |
| k. | **_Earth Movement_** – **_Annual Aggregate_** at all **_Locations_** inclusive of **_Locations_** further limited as follows: | | $100,000,000 |
| | (1) | **_Locations_** in Alaska, California, Hawaii, Puerto Rico – **_Annual Aggregate:_** | NOT COVERED |
| | (2) | **_Locations_** in **_Critical New Madrid Areas_** – **_Annual Aggregate_**: | NOT COVERED |
| | (3) | **_Locations_** in **_Critical Pacific Northwest Areas_** – **_Annual Aggregate_**: | NOT COVERED |
| l. | **_Electronic Data Processing_**: | | |
| | • | Electronic data processing equipment: | INCLUDED |
| | • | For additional perils specified in extension: | INCLUDED |
| | • | Cost of research to replace or restore information lost: | $5,000,000 |
| | • | Expense to Extract **_Computer Viruses_**: | $500,000 |
| | • | Unauthorized Computer Access: | $500,000 |
| m. | Equipment Breakdown (refer to addendum form): | | INCLUDED |
| | • | Ammonia Contamination: | $1,000,000 |
| | • | Spoilage: | $1,000,000 |
| n. | Expediting Expense: | | $10,000,000 |
| o. | Extra Expense: | | $25,000,000 |
| p. | Fine Arts: | | $1,000,000 |
| q. | Fire Brigade Charges and Extinguishing Expenses: | | $250,000 |
| r. | **_Flood_** – **_Annual Aggregate_** at all **_Locations_** inclusive of **_Locations_** further limited as follows: | | $100,000,000 |
| | • | **_Locations_** wholly or partially situated in those areas designated as 100 Year (1% annual chance of flooding) floodplains by the Federal Emergency Management Agency or other governmental authority – **_Annual Aggregate_**: | $5,000,000 |
| | • | **_Locations_** outside of 100 Year (1% annual chance of flooding) floodplains, but wholly or partially situated in those areas designated as 500 Year (0.2% annual chance of flooding) floodplains by the Federal Emergency Management Agency or other governmental authority - or areas where the flood hazard has not been determined by the Federal Emergency Management Agency or other governmental authority – **_Annual Aggregate_**: | $10,000,000 |

 Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

| | | |
|---|---|---|
| **s.** | _**Fungi, Wet Rot, Dry Rot, And Microbes**_ - _**Annual Aggregate**_: | $50,000 |
| **t.** | _**Leasehold Interest**_: | $5,000,000 |
| **u.** | Loss Adjustment Expense: | $250,000 |
| **v.** | _**Named Storm**_ per _**occurrence**_ all covered loss or damage for all _**Locations**_ inclusive of all applicable sublimits, and _**Locations**_ further limited as follows: | $750,000,000 |
| | • _**Named Storm**_ per _**occurrence**_ all _**Locations**_ in Puerto Rico and the U.S. Virgin Islands, the states of Florida and Hawaii and _**First Tier Areas**_ in all other states: | $750,000,000 |
| **w.** | Newly Acquired or Constructed Property – All Coverages Combined: | SEE ENDORSEMENT |
| **x.** | Ordinance or Law: | |
| | • Undamaged Portion of Building: | INCLUDED |
| | • Demolition Cost, and Increased Cost of Construction: | $25,000,000 |
| | • Business Interruption, Extra Expense, or Rental Value: | $2,500,000 |
| **y.** | Pollution Cleanup and Removal – _**Annual Aggregate**_: | $500,000 |
| **z.** | Preservation of Property | INCLUDED |
| **aa.** | Professional Fees: | INCLUDED |
| **bb.** | Property in Course of Construction – Soft Costs: | $1,000,000 |
| **cc.** | Property Off Premises – Including Fairs, Trade Shows and Exhibits: | $1,000,000 |
| **dd.** | Radioactive Contamination: | $5,000,000 |
| **ee.** | Rental Value: | INCLUDED |
| **ff.** | Research and Development Expenses: | $1,000,000 |
| **gg.** | Royalties: | $250,000 |
| **hh.** | Service Interruption: | |
| | • Property: | $25,000,000 |
| | • _**Time Element**_: | $10,000,000 |
| **ii.** | Transit: | |
| | • Per _**Occurrence**_: | $1,000,000 |
| | • Per Conveyance: | $1,000,000 |
| **jj.** | Trees, Shrubs, Plants and _**Land Improvements**_: | |
| | • Per _**Occurrence**_ | $1,000,000 |
| | • Per Tree, Shrub or Plant: | $25,000 |
| **kk.** | Unintentional Errors and Omissions: | $10,000,000 |

Copyright CNA All Rights Reserved.



| | | CNA Property Policy |
|---|---|---|
| | | **Signature Policy Form** |

| | | |
|---|---|---|
| ll. | Unscheduled *Locations* – All Coverages Combined: | $5,000,000 |
| mm. | Valuable Papers and Records: | $10,000,000 |
| nn. | Laboratory Animals - Per Animal: | $10,000 |
| oo. | Laboratory Animal - Per Occurrence: | $100,000 |
| pp. | Biocontamination: | $50,000 |
| qq. | Emergency Evacuation Expense: | $1,000,000 |

**5.    TIME LIMITS**

| | | |
|---|---|---|
| a. | Business Interruption Period of Indemnity: | Twenty Four (24) Months |
| b. | Denial of Access by Civil Authority / Ingress – Egress: | Ninety (90) Days |
| c. | Extended Period of Indemnity: | Three Hundred And Sixty Five (365) Days |
| d. | Newly Acquired or Constructed  Property: | One Hundred And Twenty (120) Days |
| e. | Ordinary Payroll Included in Determination of Gross Earnings: | Ninety (90) Days |
| f. | Service Interruption Qualifying Period: | Twenty Four (24) Hours |

**6.    DEDUCTIBLES**

All claims for loss, damage or expense covered under this policy and arising out of or resulting from any one *Occurrence* shall be adjusted as one claim. Except as provided below, from the amount of each such adjusted loss the sum of $100,000 shall be deducted before the Company shall be liable for any loss, damage or expense covered.

Except as provided below, in the event of any one *Occurrence* where two or more deductibles apply, the total to be deducted shall not exceed the largest deductible applicable.

When this policy insures more than one *Location*, the deductible will apply against the total loss or damage covered by this Policy in an *Occurrence*. However, a deductible that applies on a per *Location* basis, will apply separately to each *Location* where the physical loss or damage occurred regardless of the number of *Locations* involved in the *Occurrence*.

If two or more deductibles apply on a per *Location* basis in an *Occurrence*, the largest deductible applying to each *Location* will be applied separately to each such *Location*.

If two or more minimum deductibles per *Occurrence* apply to loss or damage due to *Named Storm* or *Earth Movement*, only the largest minimum deductible will be applied.

If separate physical damage and *Time Element* loss deductibles are shown, then the deductibles shall apply separately.

a.   (1)   As respects loss or damage due to *Flood* occurring at all *Locations* except as may be further provided below, the deductible shall be $100,000 per *Occurrence*.

(2)   As respects loss or damage due to *Flood* occurring anywhere within the policy territory at *Locations* wholly or partially situated in those areas designated as 100 Year (1% annual chance of flooding)  floodplains by the Federal Emergency Management Agency or other governmental authority, the deductible for *Flood* shall be the sum of:

- $500,000 for physical damage to covered real property;

- $500,000 for physical damage to covered personal property while at an insured *location*; and

- $250,000 for *Time Element*;

for each **Location** damaged.

Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

(3)    As respects loss or damage due to **_Flood_** occurring anywhere within the policy territory at **_Locations_** outside of 100 Year (1% annual chance of flooding) floodplains, but wholly or partially situated in those areas designated as 500 Year (0.2% annual chance of flooding) floodplains by the Federal Emergency Management Agency or other governmental authority or areas where the flood hazard has not been determined by the Federal Emergency Management Agency or other governmental authority, the deductible for **_Flood_** shall be the sum of:

- $100,000 for physical damage to covered real property;

- INCLUDED for physical damage to covered personal property while at an insured location; and

- INCLUDED for **_Time Element_**,

for each **_Location_** damaged.

However, this deductible shall not apply to ensuing loss by fire or explosion.

b.    (1)    As respects loss or damage due to **_Earth Movement_** occurring at all **_Locations_** except as may be further provided below, the deductible shall be $100,000 per **_Occurrence_**.

(2)    As respects loss or damage due to **_Earth Movement_** at **_Locations_** in the states of California, Hawaii and Alaska, and Puerto Rico, the deductible shall be the sum of:

- NOT COVERED for physical damage per **_Location_**, and

- NOT COVERED for **_Time Element_** per **_Location_**.

Subject to a minimum of NOT COVERED in any one **_Occurrence_**.

(3)    As respects loss or damage due to **_Earth Movement_** at **_Locations_** in **_Critical New Madrid Areas_** the deductible shall be the sum of:

- NOT COVERED for physical damage per **_Location_**, and

- NOT COVERED for **_Time Element_** per **_Location_**.

Subject to a minimum of NOT COVERED in any one **_Occurrence_**.

(4)    As respects loss or damage due to **_Earth Movement_** at **_Locations_** in **_Critical Pacific Northwest Areas_**, the deductible shall be the sum of:

- NOT COVERED for physical damage per **_Location_**, and

- NOT COVERED for **_Time Element_** per **_Location_**.

Subject to a minimum of NOT COVERED in any one **_Occurrence_**.

However, this deductible shall not apply to ensuing loss by fire, explosion or leakage from fire protective systems or devices.

c.    (1)    As respects loss or damage due to wind or hail (other than wind or hail associated with a **_Named Storm_**) occurring at all **_Locations_**, except as may be further provided below, the deductible shall be $100,000 per **_Occurrence_**.

d.    (1)    As respects loss or damage due to wind or hail associated with a **_Named Storm_** occurring at all **_Locations_**, except as may be further provided below, the deductible shall be $100,000 per **_Occurrence_**.

(2)    As respects loss or damage due to wind or hail associated with a **_Named Storm_** at **_Locations_** in Puerto Rico or the U.S. Virgin Islands, the deductible shall be the sum of:

- five percent (5%) for physical damage per **_Location_**, and

- five percent (5%) for **_Time Element_** loss per **_Location_**.

Subject to a minimum of $250,000 in any one **_Occurrence_**.

Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

(3) As respects loss or damage due to wind or hail associated with a ***Named Storm*** at ***Locations*** in the states of Florida and Hawaii, and in ***First Tier Areas*** in all other states, the deductible shall be the sum of:

- two percent (2%) for physical damage per ***Location***, and

- two percent (2%) for ***Time Element*** loss per ***Location***.

Subject to a minimum of $250,000 in any one ***Occurrence***.

e. As respects loss or damage under the additional coverage **TRANSIT** the deductible shall be $100,000.

f. As respects loss or damage under the additional coverage **Equipment Breakdown** the deductible shall be:

| | |
|---|---|
| Physical Damage: | $100,000 |
| Time Element: | Included with Physical Damage Deductible |
| Spoilage: | Included with Physical Damage Deductible |

**Application of *Earth Movement* and *Named Storm* Percentage Deductibles:**

**Physical Damage:** In the event of a claim for physical damage loss, the Company shall not be liable unless the Insured sustains a loss greater than the applicable percentage of the property value including foundations (replacement cost or actual cash value based on Section **IV. 12. VALUATION** of this form), at each ***Location*** where the physical damage occurred, and then only for its share of that greater amount in excess of the applicable percentage.

***Time Element***: In the event of a claim for ***Time Element*** loss, the Company shall not be liable unless the Insured sustains a loss greater than the applicable percentage of the full annual ***Time Element*** value which would have been earned in the twelve (12) month period following the loss by use of the facilities at each ***Location*** where the physical damage occurred, and then only for its share of that greater amount in excess of the applicable percentage.

 Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

---

| **II.** | **COVERAGE** |
|---|---|

Except as hereafter excluded and subject to the **LIMITS OF LIABILITY** in Section **I.4.** and all other policy provisions, this policy insures against risks of direct physical loss of or damage to property and/or interests described herein at covered *Locations*. Unless otherwise indicated, all items contained herein are part of and not in addition to the **POLICY LIMIT** shown in Section **I.4.**

| **A.** | **PROPERTY** |
|---|---|

**1.      COVERED PROPERTY AND RELATED INTERESTS**

a.      The interest of the Insured in all real and personal property owned or used by the Insured, or hereafter erected, installed, or acquired, including while in course of building, erection, installation, and assembly, and including interest in ***Improvements and Betterments***.

In the event of loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of ***Improvements and Betterments***, notwithstanding any contracts or leases to the contrary.

b.      The interest of the Insured in the real and personal property of others in the Insured's care, custody and control, and the Insured's liability imposed by law or assumed by contract for physical loss or damage to such property.

c.      Personal property of the Insured's officers and employees while at ***Locations*** of the Insured, or within one thousand (1,000) feet thereof.

For the purpose of coverage provided herein, personal property shall mean business personal property owned by the Insured or by officers and employees of the Insured which is usual to the occupancy of the Insured, including manuscripts, furniture, fixtures, equipment (including Electronic Data Processing Equipment) and supplies not otherwise excluded under this policy. Such property is covered while at or within one thousand (1,000) feet of the ***Locations*** insured by this policy.

**2.      PROPERTY NOT COVERED**

**This policy does <u>not</u> cover the following types of property or interests (unless otherwise provided for elsewhere in this form or endorsed hereon):**

a.      ***Money***, deeds, accounts, bills, stamps, letters of credit, evidence of debt, notes, ***Securities***;

b.      Standing timber, growing crops, trees, shrubs and plants, animals or livestock except stock for sale;

c.      Land (including water or any other substance in land, or water on land), land values, excavations, the cost to replace land lost to ***Earth Movement*** or ***Flood***;

d.      Personal property leased or rented to others for more than 180 days; or property sold by the Insured under conditional sale, trust agreement, installment plan, or other deferred payment plan after such property has been delivered to customers;

e.      Property in the course of transit, except as provided in Section **II.C.34. TRANSIT**;

f.      Transmission and distribution lines of any type, owned, operated, controlled by or leased by the Insured, beyond one thousand (1,000) feet of covered ***Locations***;

g.      Satellites and spacecraft on the launch pad or after launch;

h.      Furs, jewelry, watches, precious stones and metals, gold, silver, including bullion and fine arts other than as included in Section **I.4.** This exclusion does not apply to precious metals and stones used by the Insured for industrial purposes;

i.      Watercraft, aircraft; railroad rolling stock, and motor vehicles licensed for highway use when not at the Insured's ***Locations***;

---

Copyright CNA All Rights Reserved.



j.   Underground mines, caves, caverns, tunnels and any property contained therein or any property underground. This exclusion does not apply to footings and foundations of covered buildings or machinery; underground pipes, flues, drains and tanks; or property in basements or cellars;

k.   . Off-shore property, drilling rigs, production rigs and platforms, including personal property thereon;

l.   Bridges, dams, dikes, docks, bulkheads, reservoirs, retaining walls, pilings, piers and wharves, when loss or damage is caused by water pressure, ice or impact of watercraft;

m.   Contraband or any property in course of illegal transport or trade;

n.   Property or interests more specifically covered under another policy, except as excess under the terms of that policy.

---

**B.   TIME ELEMENT**

---

**1.   BUSINESS INTERRUPTION (GROSS EARNINGS)**

a.   This policy covers against loss resulting from necessary interruption of business caused by direct physical loss of or damage to covered property, except _**Finished Stock**_, by the peril(s) insured against and occurring during the term of this policy at covered _**Locations**_ occupied by the Insured, subject to the sublimit specified in Section **I.4.** of this policy.

In the event of such physical loss or damage the Company shall be liable for the actual loss sustained by the Insured resulting directly from such interruption of business, but not exceeding the reduction in **Gross Earnings** as set forth below less charges and expenses which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy, but in no event to exceed the number of months specified in Section **I.5. TIME LIMITS** if a Business Interruption Period of Indemnity limit is specified.

b.   **Determination of Gross Earnings:**

(1)   Manufacturing _**Locations**_: **Gross Earnings** are the sum of:

(a)   Total net sales value of production;

(b)   Total net sales of _**Merchandise**_; and

(c)   Other earnings derived from operations of the business;

_Less the cost of:_

(d)   _**Raw Stock**_ from which production is derived;

(e)   Supplies consisting of materials consumed directly in the conversion of such _**Raw Stock**_ into _**Finished Stock**_ or in supplying the service(s) sold by the Insured;

(f)   _**Merchandise**_ sold, including packaging materials therefore;

(g)   Service(s) purchased from outsiders (not employees of the Insured) for resale which do not continue under contract;

(h)   Ordinary Payroll expense (the entire payroll expense for all employees of the insured, except officers, executives, department managers and employees under contract) beyond the number of days included in Section **I.5.** of this policy;

(i)   Depreciation Expense for any asset destroyed by perils insured hereunder; and

(j)   Other Discontinued Expenses meaning any other operating expenses discontinued as a result of the direct physical loss or damage caused by peril(s) insured against.

   Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

(2) Mercantile & Non-Manufacturing **_Locations_**: **Gross Earnings** are the sum of:

    (a) Total net sales; and

    (b) Other earnings derived from operations of the business;

*Less the cost of:*

    (c) **_Merchandise_** sold, including packaging materials therefore;

    (d) Materials and supplies consumed directly in supplying the service(s) sold by the Insured;

    (e) Service(s) purchased from outsiders (not employees of the Insured) for resale which do not continue under contract;  and

    (f) Depreciation Expense for any asset destroyed by perils insured hereunder;

    (g) Ordinary Payroll expense (the entire payroll expense for all employees of the insured, except officers, executives, department managers and employees under contract) beyond the number of days included in Section **I.5.** of this policy; and

    (h) Other Discontinued Expenses meaning any other operating expenses discontinued as a result of the direct physical loss or damage caused by a peril insured against.

---

**C.  ADDITIONAL COVERAGES, COVERAGE EXTENSIONS AND LIMITATIONS**

**1.  ACCOUNTS RECEIVABLE**

This policy also covers subject to the sublimit specified in Section I.4. of this policy:

**a.** All sums due the Insured from customers, which the Insured is unable to collect solely as the direct result of direct physical loss or damage by peril(s) insured against to the Insured's records of accounts receivable;

**b.** Interest charges on any loan to offset impaired collections pending repayment of such sums made uncollectible by such loss or damage;

**c.** Collection expense in excess of **_Normal_** collection cost and made necessary because of such loss or damage;

**d.** Other expenses, when reasonably incurred by the Insured in reestablishing records of accounts receivable following such loss or damage.

For the purpose of this insurance, credit card company charge **_Media_** shall be deemed to represent sums due the Insured from customers, until such charge **_Media_** is delivered to the credit card company.

When there is proof that a loss of records of accounts receivable has occurred but the Insured cannot more accurately establish the total amount of accounts receivable outstanding as of the date of such loss, such amount shall be computed as follows:

**e.** The monthly average of accounts receivable during the last available twelve (12) months, together with collection expenses in excess of **_Normal_** collection costs during the last available twelve (12) months and made necessary because of such loss or damage, and reasonable expenses incurred in reestablishing records of accounts receivable following such loss or damage, shall be adjusted in accordance with the percentage increase or decrease in the twelve (12) months from when last available average of monthly gross revenues which may have occurred in the interim.

**f.** The monthly amount of accounts receivable thus established shall be further adjusted in accordance with any demonstrable variance from the average for the particular month in which the loss occurred.

There shall be deducted from the total amount of accounts receivable, however established, the amount of such accounts evidenced by records not lost or damaged, or otherwise established or collected by the Insured, and an amount to allow for probable bad debts which would **_Normally_** have been uncollectible by the Insured.

Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

2.   **ARSON and CRIME REWARD**

The Company will pay up to the sublimit specified in Section **I.4.** of this policy for information that leads to an arson or other criminal conviction in connection with a loss covered under this policy.

3.   **BRAND OR TRADEMARK REMOVAL**

In case of covered physical damage to property bearing a brand or trademark of the Named Insured or which in any way carries or implies the guarantee or the responsibility of the Named Insured, the salvage value of such damaged property shall be determined after removal in the customary manner of all such brands or trademarks or other identifying characteristics. The Company will pay up to the Brand or Trademark Removal sublimit specified in Section **I.4.** of this policy for the reasonable costs incurred in the removal of such brands, trademarks or identifying characteristics.

4.   **CONTINGENT BUSINESS INTERRUPTION (GROSS EARNINGS)**

Subject to the sublimits for scheduled and unscheduled dependent properties specified in Section **I.4.** of this policy, the policy is extended to pay for loss resulting from necessary interruption of business conducted at **Locations** occupied by the Insured and covered in this policy, caused by direct physical loss or damage by peril(s) insured against to:

a.   any real or personal property of the type insured hereunder of direct suppliers or service providers  which wholly or partially prevents the delivery of materials, products or services (other than water, communication or power supply) to the Insured or to others for the account of the Insured; or

b.   any real or personal property of the type insured hereunder of direct customers to whom the Insured's product(s) or services (other than water, communication or power supply) is provided, which wholly or partially prevents the acceptance of said product(s) or services;

c.   any real or personal property of the type insured that is operated by others that the Insured depends upon to attract customers.  Coverage is limited to dependent property within 5 miles of the Insured's **Location** unless it is a Scheduled Dependent Property.

5.   **CONTRACT PENALTIES**

This Company will pay contractual penalties incurred by the insured for its failure to timely deliver its products or services to its customers according to the contract terms, but only when such failure results solely from covered direct physical loss or damage to covered property, subject to the sublimit specified in Section **I.4.** of this policy.

6.   **DEBRIS REMOVAL**

This policy also covers the reasonable and necessary costs and expenses the Insured incurs, due to physical loss or damage from a peril covered under this policy, for removing from a covered **Location**, debris remaining after such physical loss or damage to property of the type insured under this policy.

The maximum amount payable under this clause is the Debris Removal Sublimit specified in Section **I.4.** of this policy.

This Coverage part does not apply to the increased cost of removal or disposal of covered property due to **Contaminants or Pollutants**.

There shall be no liability for the expense of removing contaminated property not covered by this policy or the **Contaminants or Pollutants** therein or thereon, whether or not the contamination results from an insured event.

7.   **DECONTAMINATION EXPENSE**

Subject to the Decontamination Expense sublimit in Section **I.4.**, if covered property is contaminated as a direct result of physical damage caused by perils insured against, or if the damaged covered property inherently contains **Contaminants or Pollutants, and** there is in force at the time of such damage any law or ordinance regulating contamination, including but not limited to pollution, then this policy covers, as a result of enforcement of such law or ordinance, the increased cost of decontamination of the covered property and debris removal of such property in a manner to satisfy the minimum requirements of such law or ordinance.

Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

If this policy includes *Time Element* coverage, the period of interruption for *Time Element* coverage is extended to include the additional time as is necessary and reasonable, with the exercise of due diligence and dispatch, to decontaminate covered property in a manner to satisfy the minimum conditions of the aforementioned law or ordinance. Any increase in *Time Element* loss shall also be included in the Decontamination Expense sublimit.

There is no liability for expense or time required for removing contaminated property not insured under this policy or the contaminant therein or thereon, whether or not the contamination results from an insured *Occurrence*.

This coverage part does not apply to **RADIOACTIVE CONTAMINATION**.

8.  **DEFENSE COSTS**

Subject to the sublimit in Section **I.4.** this policy covers the cost to defend any suit against the Insured alleging physical loss or damage as insured against, to real or personal property of others in the care, custody control of the Insured to the extent of the Insured's Liability therefore, even if such suit is groundless, false or fraudulent; but the Company may, without prejudice, make such investigation, negotiation or settlement of any such claim or suit as they deem expedient.

9.  **DEFERRED PAYMENTS**

Subject to the Deferred Payments sublimit in Section **I.4.** the Company will reimburse the Insured for payments the Insured is unable to collect due to direct physical loss or damage within Territorial Limits to *Merchandise* or *Finished Stock* sold by the Insured on an installment or other deferred payment basis after it has been accepted by the Insured's customer(s). In no event shall this Company pay more than the Insured's financial interest in such property,

10. **DENIAL OF ACCESS BY CIVIL AUTHORITY AND INGRESS-EGRESS**

This policy is extended to cover for up to the time limit specified in Section **I.5.** but not exceeding the sublimit shown in Section **I.4.** of this policy, the actual loss sustained:

a.  during the period of time while access to the Insured's *Location* is prohibited by order of civil authority, but only when such order is given as a direct result of physical loss or damage to property of the type insured from a peril insured against occurring at or in the immediate vicinity of said *Location*; or

b.  during the period of time when as a direct result of physical loss or damage to property of the type insured from a peril insured against, ingress to or egress from the Insured's *Location* is thereby physically prevented.

11. **ELECTRONIC DATA PROCESSING**

This policy also covers:

a.  *Electronic Data Processing Equipment* for loss caused by or resulting from these additional perils:

    (1)  Artificially generated electrical current, including arcing that disturbs electrical devices, appliances, or wires; or

    (2)  Mechanical breakdown and machinery breakdown, including malfunction or component failure;

    all subject to the Limits specified in Section **I.4.** of this policy.

b.  *Electronic Media and Records*: for the cost of research to replace or restore the information lost due to perils insured, subject to the sublimit specified in Section **I.4.** of this policy.

    The Company will not pay for loss or damage due to accidental erasure of information on *Electronic Media and Records* in the absence of physical damage to the *Electronic Media and Records*.

c.  *Computer Virus*: This Company will also pay for the expense incurred by the Insured to extract *Computer Viruses* that become known to the Insured during the policy period even though no direct loss or damage has occurred, subject to the sublimit specified in Section **I.4.** of this policy.

    The Insured must report such *Occurrence* within one hundred-eighty (180) days of knowledge thereof for payment to be made under this clause.

G300709A (10-08)          Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

    **d.**    **Unauthorized Computer Access:** With respect to the Insured's information systems operations, subject to the sublimit specified in Section **I.4.** of this policy, coverage shall include:

        **(1)**    Accidental, intentional or malicious distortion, corruption, manipulation, erasure or loss by unauthorized persons of ***Media***, ***Data***, ***Application Software***, ***System Software*** or ***Source Code*** owned or operated on the Insured's ***Electronic Data Processing Equipment***;

        **(2)**    ***Theft*** of any covered property (other than by an employee of the Insured) or willful acts causing loss or damage to covered property by any person when such loss results from the unauthorized use of the Insured's ***Electronic Data Processing Equipment*** including ***Media***, ***Data***, ***Application Software***, ***System Software*** or ***Source Code***. This provision does not apply to ***Money*** and ***Securities*** or any other property specifically excluded in this policy.

**12.**    **EXPEDITING EXPENSES**

This Company will pay reasonable and necessary costs incurred by the Insured to expedite repairs to covered property following loss or damage covered under this policy. This includes payment of overtime wages and the extra cost to use express or other rapid means of transportation, subject to the sublimit specified in Section **I.4.** of this policy. However, coverage is not included hereunder for costs recoverable elsewhere in this policy or for the permanent repair or replacement of damaged property.

**13.**    **EXPENSES RELATED TO REDUCING LOSS**

This policy covers such expenses as are necessarily incurred for the purpose of reducing a ***Time Element*** loss (except expense incurred to extinguish a fire) and such expenses, in excess of ***Normal***, as would necessarily be incurred in replacing any ***Finished Stock*** used by the Insured to reduce loss. But in no event shall the aggregate of such expenses exceed the amount by which the loss otherwise recoverable elsewhere in this policy is thereby reduced.

**14.**    **EXTENDED PERIOD OF INDEMNITY**

    **a.**    Business Interruption other than Rental Value:

    This policy is extended to cover the loss of **Gross Earnings** sustained by the Insured resulting directly from the interruption of business, as covered by this policy, for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred, commencing with the later of the following dates:

        **(1)**    the date on which the liability of the Company for loss under Section **II.B.1.a.** would terminate if this provision had not been added to this policy; or

        **(2)**    the date on which the repair, replacement or rebuilding of damaged or destroyed covered property is actually completed;

    but in no event for more than the number of days indicated in Section **I.5.** of this policy.

    **b.**    Rental Value:

    This policy is extended to cover the loss of Rental Value sustained by the Insured resulting directly from the untenantability of insured premises, as covered by this policy, for such additional length of time as would be required with the exercise of due diligence and dispatch to restore tenant occupancy to the condition that would have existed had no loss occurred, commencing with the later of the following dates:

        **(1)**    the date on which the liability of the Company for loss under Section **II.C.30. RENTAL VALUE** would terminate if this provision had not been added to this policy; or

        **(2)**    the date on which the repair, replacement or rebuilding of damaged or destroyed covered property is actually completed;

    but in no event for more than the number of days indicated in Section **I.5.** of this policy.

**15.**    **EXTRA EXPENSE**

The Company will pay for the reasonable and necessary extra expense, as hereinafter defined, incurred by the Insured in order to continue as nearly as practicable the ***normal*** operation of the Insured's business following direct physical loss of or damage to covered property by perils(s) insured against.



In the event of such physical loss or damage, the Company shall be liable for such reasonable and necessary extra expense incurred for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property as has been damaged, commencing with the date of damage and not limited by the date of expiration of this policy, subject to the sublimit specified in Section **I.4.** of this policy.

16.   **FINE ARTS**

This policy is extended to cover physical loss or damage from peril(s) insured against to fine arts in which the Insured has an interest, subject to the sublimit specified in Section **I.4.** of this policy and the following:

Additional Exclusions - This extension does not insure against loss or damage caused by:

**a.**   any repairing, restoration or retouching process performed on any fine arts;

**b.**   breakage of statuary, art glass windows, glassware, bric-a-brac, marble, porcelain and similar fragile property unless such breakage is caused by a peril insured under this policy.

For purposes of the coverage provided herein, fine arts means property that is rare or has historic or artistic value including works of art, antiques, rare articles, etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac.

17.   **FIRE BRIGADE CHARGES AND EXTINGUISHING EXPENSES**

This policy also covers fire brigade charges and other extinguishing expenses for which the Insured may be assessed after a covered loss hereunder, subject to the sublimit specified in Section **I.4.** of this policy.

18.   **FUNGI, WET ROT, DRY ROT AND MICROBES**

**a.**   This policy covers loss or damage by ***Fungi***, wet rot, dry rot and ***Microbes***, when the ***Fungi***, wet rot, dry rot and ***Microbes*** are the result of covered physical loss, damage or destruction of property insured by this policy, but only if;

  **(1)**   The Covered Cause of Loss from which the ***Fungi***, wet rot, dry rot  and ***Microbes*** loss or damage resulted occurred during this policy period; and

  **(2)**   All reasonable means were used to save and preserve the property from further damage at the time of and after that ***Occurrence***; and

  **(3)**   The existence of the ***Fungi***, wet rot, dry rot  and ***Microbes*** loss or damage is reported as soon as practicable, but no later than 180 days after the ***Occurrence*** of the Covered Cause of Loss from which the ***Fungi***, wet rot, dry rot and ***Microbes*** loss or damage resulted.

**b.**   As used in this policy, the term ***Fungi***, wet rot, dry rot and ***Microbes*** loss or damage means:

  **(1)**   Direct physical loss or damage to covered property caused by ***Fungi***, wet rot, dry rot  and ***Microbes***, including the cost of removal of the ***Fungi***, wet rot, dry rot  and ***Microbes***;

  **(2)**   The cost to tear out and replace any part of the building or other property as needed to gain access to the ***Fungi***, wet rot, dry rot and ***Microbes***; and

  **(3)**   The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that ***Fungi***, wet rot, dry rot and ***Microbes***, are present.

**c.**   Coverage is subject to the ***Fungi***, wet rot, dry rot and ***Microbes*** sublimit specified in Section **I.4.** Regardless of the number of claims, this limit is the most the Company will pay for the total of all loss or damage arising out of all ***Occurrences*** of Covered Causes of Loss which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular ***Occurrences*** of loss which results in ***Fungi***, wet rot, dry rot and ***Microbes***, the Company will not pay more than the ***Fungi***, wet rot, dry rot and ***Microbes*** Sublimit, even if the ***Fungi***, wet rot, dry rot  and ***Microbes***, continues to be present or active, or recurs, in a later policy period.

          Copyright CNA All Rights Reserved.



**d.** This coverage does not increase the applicable limit or sublimit of liability on any covered property, or applicable sublimit of any Covered Cause of Loss. If a particular _**occurrence**_ results in loss or damage by _**Fungi**_, wet rot, dry rot and _**Microbes**_, and other loss or damage, the Company will not pay more, for the total of all loss or damage, than the applicable Limit or Sublimit of Insurance on the affected covered property.

If there is covered loss or damage to covered property, not caused by _**Fungi**_, wet rot, dry rot and _**Microbes**_, loss payment will not be limited by the terms of this Coverage, except to the extent that _**Fungi**_, wet rot, dry rot and _**Microbes**_, causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

**19.    LEASEHOLD INTEREST**

Subject to the sublimit specified in Section **I.4.** of this policy and all other policy provisions, this policy covers the interest of the Insured as lessee at all leased real property.

Recovery in the event of loss hereunder shall be the actual loss sustained to the _**Leasehold Interest**_ by the Insured if caused by physical loss or damage of the type insured against by this policy to real property of the type covered by this policy situated at _**Locations**_ occupied by the Insured, as follows:

**a.** The actual rent which remains payable for the unexpired term of the lease if such property becomes wholly untenable or unusable and the lease agreement requires continuation of the rent payment; or

**b.** the proportion of rent which remains payable for the unexpired term of the lease if such property becomes partially untenable or unusable and the lease agreement requires continuation of the rent payment; or

**c.** the _**Leasehold Interest**_ for the first three (3) months following loss or damage and the _**Net Leasehold Interest**_ for the remaining unexpired term of the lease if the lease is canceled by the lessor pursuant to the lease agreement or by the operation of law.

Exclusions: This Section does not insure against any loss or expense resulting from:

**(1)** the suspension, lapse, or cancellation of any license; or

**(2)** the Insured exercising an option to cancel the lease; or

**(3)** any act or omission by the Insured which constitutes a default under the lease.

Additional Condition: It is a condition of this Section that the Insured shall use any suitable property or service owned or controlled by the Insured or obtainable from another source to reduce the amount of loss hereunder.

**20.    LOSS ADJUSTMENT EXPENSE**

This insurance applies to the reasonable expenses incurred by the Insured in preparing claim data when required by the Company, subject to the sublimit in Section I.4. This includes the cost of taking inventories, obtaining appraisals and preparing other documentation to show the extent of loss. The Company will not pay for any expenses incurred, directed, or billed by or payable to attorneys, public adjusters, insurance brokers or agents or their associates or subsidiaries, or any costs as provided in Section **IV. LOSS CONDITIONS 1. APPRAISAL**.

**21.    MACHINERY/PAIR AND SET**

In case of physical loss or damage caused by peril(s) insured against in this policy to any part of a machine or unit (consisting of two or more parts when complete either for sale or use), the liability of the Company shall be limited to the value of the part or parts lost or damaged or, at the Insured's option, to the cost and expense of replacing or duplicating the lost or damaged part or parts or of repairing the machine or unit.

In case of loss to any part of a pair or set, the Company may repair or replace such part to restore the pair to its value before the loss, or pay the difference between the value of the pair or set before and after the loss. In no event shall such loss or damage be construed to mean total loss of the pair or set.

**22.    NEWLY ACQUIRED or CONSTRUCTED PROPERTY**

This policy covers newly acquired property of the Insured at any _**Location**_ within the territorial limit of the policy

Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

that is not listed on the schedule of ***Locations*** and values on file with the Company; and new buildings constructed at any ***location***; subject to the Newly Acquired or Constructed Property sublimit specified in Section **I.4.** of this policy and the following conditions:

**a.**     The Insured's interest is not covered under any other policy;

**b.**     The insured shall report newly acquired property or the beginning of construction of new buildings to this Company within the Newly Acquired or Constructed Property Time Limit specified in Section **I.5.**, otherwise coverage under this policy shall cease except to the extent of any sublimit stated elsewhere for Unscheduled ***Locations***; and

**c.**     Additional premium shall be payable from the date of acquisition or beginning of construction thereof.

If this policy includes ***Time Element*** coverage, any ***Time Element*** loss resulting from covered physical loss or damage at a newly acquired ***Location***, or newly constructed building shall also be included in the Newly Acquired or Constructed Property sublimit.

This coverage excludes loss or damage directly or indirectly caused by or resulting from ***Earth Movement*** or ***Flood***.

**23.     ORDINANCE OR LAW, DEMOLITION COST, AND INCREASED COST OF CONSTRUCTION**

In the event of physical loss or damage covered hereunder that causes the enforcement of any law or ordinance in effect at the time of loss regulating the construction, repair or use of the damaged building(s), this Company shall be liable for:

**a.**     The value of the undamaged portion of the damaged building(s) that must be demolished;

**b.**     The cost of demolishing the undamaged portion of the damaged building(s) that must be demolished because of such law or ordinance, including the cost of clearing the site;

**c.**     The increased cost of repair or reconstruction of the damaged and undamaged portion of the damaged building(s) on the same site or another site, but limited to the costs that would have been incurred in order to comply with the minimum requirements of such law or ordinance regulating the repair or reconstruction of the damaged building(s) on the same site; and

**d.**     The increased loss or costs for business interruption, extra expense or rental value arising out of the additional time required to comply with said law or ordinance.

The Company shall not be liable for any costs attributable to any ordinance or law that the Insured was required to, but failed to, comply with before the loss.

The Company shall not be liable under **23.c.** or **23.d.** of this clause for any loss unless the damaged building is actually repaired, rebuilt or replaced with property of the same size and occupancy on the same site or at another site as soon as reasonably possible.

This coverage does not increase the applicable limit or sublimit of any Cause of Loss.  For example, if ***Earth Movement*** or ***Flood*** are the cause of the physical loss or damage which results in the enforcement of an ordinance or law regulating the construction, repair or use of a damaged building, the most the Company will pay for all loss or damage including this coverage, is the ***Earth Movement*** or ***Flood*** sublimit in Section **I.4.**

The Company will not pay under this coverage for loss due to the enforcement of any ordinance or law which requires an Insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the affects of ***Contaminants or Pollutants***.

In no event will the Company pay more under this coverage than the Ordinance or Law sublimits specified in Section **I.4.** of this policy.

**24.     POLLUTION CLEAN UP AND REMOVAL**

The Company will pay the Insured's expense to extract ***Contaminants or Pollutants*** from land or water at insured ***Locations*** if the presence of the ***Contaminants or Pollutants*** is caused by or results from a covered peril that occurs during the policy period, subject to the ***Annual Aggregate*** sublimit specified in Section **I.4.** of this policy.

     Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

Costs to test for, monitor or assess the existence, concentration or effects of **_Contaminants or Pollutants_** are not covered, but the Company will pay for testing which is performed in the course of extracting the **_Contaminants or Pollutants_** from land or water, subject to the Pollution Cleanup and Removal sublimit specified in Section **I.4.** of this policy

The expenses will be paid only if they are reported to the Company within one hundred- eighty (180) days of the date on which the loss or damage at insured **_Locations_** occurs.

**25.   PRESERVATION OF PROPERTY**

If it is necessary to move covered property from an insured **_Location_** to preserve it from direct physical loss or damage by peril(s) insured against the Company will pay for any direct physical loss or damage to that property:

**a.**      While it is being moved or while temporarily stored at another location; and

**b.**      Only if the loss or damage occurs within 60 days after the property is first moved.

**26.   PROFESSIONAL FEES**

This policy is extended to cover the fees of architects, surveyors, consulting engineers and fees of other professionals necessarily incurred in the work of repairing or rebuilding the property following a loss subject to the sublimit specified in Section **I.4.** of this policy. Such fees do not include those incurred by the Insured in the preparation of any claim.

**27.   PROPERTY IN THE COURSE OF CONSTRUCTION – SOFT COSTS**

This policy includes, subject to the Property In the Course of Construction – Soft Costs sublimit specified in Section **I.4.** of this policy, Soft Cost expenses incurred due to physical loss or damage from peril(s) insured against for that property described in **II.A.1.** which is in the course of construction, installation, erection, start-up, commissioning, reconstruction, repairs, alteration, or renovation and the like at **_Locations_** insured hereunder.

Soft Cost expenses include the following reasonable and necessary expenses which are over and above those which would have **_normally_** been incurred had no loss occurred:

**a.**      Additional interest expense;

**b.**      General overhead-developer expenses and additional real estate taxes;

**c.**      Legal or professional fees;

**d.**      Extra marketing expenses and advertising fees;

**e.**      Debt service payments and insurance premiums;

**f.**      Refinancing charges and bond interest.

**28.   PROPERTY OFF PREMISES**

This policy is extended to cover property that is temporarily at a location the Insured does not own, lease or operate, including property in the care, custody or control of a salesperson; or at any fair, exhibition or trade show.

This extension does not apply to property in the due course of transit.

This coverage is subject to the sublimit specified in Section **I.4.** of this policy.

**29.   RADIOACTIVE CONTAMINATION**

This policy covers loss or damage caused by sudden and accidental radioactive contamination, including resultant radiation damage, to the property covered hereunder, provided that such radioactive contamination arises out of material originating at the Insured **_Locations_**, and provided, at the time of such loss, there is neither a nuclear reactor capable of sustaining nuclear fission in a self supporting chain reaction, nor any new or used nuclear fuel which is intended for or which has been used in such a nuclear reactor, at the Insured's Locations. This coverage is subject to the sublimit specified in Section **I.4.** of this policy.

Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

30. **RENTAL VALUE**

Subject to the sublimit specified in Section **I.4.** of this policy, recovery in the event of loss hereunder shall be the actual loss sustained by the Insured resulting directly from necessary untenantability of insured premises, caused by direct physical loss or damage from peril(s) insured against , but not exceeding the reduction in rental value less charges and expenses which do not necessarily continue during the period of untenantability for only such length of time as would be required, with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property insured herein as has been damaged, commencing with the date of such damage and not limited by the date of expiration of this policy.

For purposes of this policy, rental value is defined as the sum of:

The total anticipated gross rental income from tenant occupancy of the covered property, and

a.     the amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be obligations of the Insured, and

b.     the fair rental value of any portion of the said property which is occupied by the Insured.

In determining the rental value, due consideration shall be given to the rental experience before the date of the damage and the probable experience thereafter had no loss occurred.

As respects rental value coverage, this policy also covers such expenses as are necessarily incurred for the purpose of reducing loss, but in no event shall the aggregate of such expenses exceed the amount by which the loss otherwise payable under this policy is thereby reduced.

31. **RESEARCH AND DEVELOPMENT EXPENSES**

In the event of direct physical loss or damage by peril(s) insured against to covered property which results in an interruption of research and development activities, which in themselves would not have produced income during the period of restoration, this policy shall cover the actual loss sustained of the continuing fixed charges and expenses, including ordinary payroll directly attributable to such research and development activities, subject to the sublimit specified in Section **I.4.** of this policy.

32. **ROYALTIES**

This policy is extended to cover the actual loss of royalties, commissions or similar fees the Insured sustains resulting from direct physical loss or damage to property of another not insured under this policy with whom the Insured has a royalty, licensing or commission agreement if that loss or damage is caused by a covered peril. The most the Company will pay under this coverage is the sublimit specified in Section **I.4.** of this policy.

33. **SERVICE INTERRUPTION**

This policy is extended to provide coverage when any direct physical loss or damage to unowned property described in paragraphs **a.** or **b.** below is caused directly by peril(s) insured against, (including covered **Equipment Breakdown** if applicable) and which, without the intervention of any other independent cause, results in a sequence of events which cause direct physical loss or damage to covered property at a covered ***Location***, including loss caused by a change in temperature or humidity, and/or ***Time Element*** loss, as provided by this policy.

a.     Property, not otherwise excluded, at covered ***Locations*** and within one thousand (1,000) feet thereof that is used by the Insured for: air conditioning; communications; cooling; heating; humidifying; lighting; refrigeration; or generation and/or conversion of power. This includes all associated transmission and distribution lines while on covered ***Locations*** and within one thousand (1,000) feet thereof.

b.     Property, not otherwise excluded, beyond one thousand (1,000) feet from covered ***Locations*** that provides the Insured services of: communications; electricity; fuel; gas; refrigeration; sewer; steam; or water to covered ***Locations***. This includes generating equipment, switching stations, substations, transformers, pumping and storage facilities, but excludes any associated transmission and distribution lines beyond the physical boundaries of the service providing facility.

(1)     The physical damage deductible for this coverage is the applicable deductible for the covered peril causing such physical loss or damage to such unowned property.

 Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

    **(2)**    Coverage for any _**Time Element**_ loss, as provided by this policy, for this coverage applies only if any of the above mentioned services are continuously affected, as described above, for more than the number of hours specified in Section **I.5.** Service Interruption Qualifying Period.

           In the event that the qualifying period has been satisfied, the Company shall then be liable for the amount of the _**Time Element**_ loss until the resumption of _**Normal**_ operations, in excess of the applicable deductible for the covered peril causing such physical loss or damage to such unowned property.

    Liability under **33.b.** is subject to the Service Interruption sublimits specified in Section **I.4.** of this policy.

**34.**    **TRANSIT**

This policy is extended to cover the property insured while in due course of transit within the Territorial Limits of the policy from the time the property leaves the location at the initial point of shipment and continuously thereafter, until delivered at the final destination. Coverage shall include general average or salvage charges on shipments covered while waterborne.

This extension of coverage also insures against physical loss or damage:

**a.**    Occasioned by the acceptance by the Insured, Insured's agent, customer or consignee or others of fraudulent bills of lading, shipping or messenger receipts;

**b.**    Occasioned by fraud or deceit, perpetrated by any person(s) who may represent themselves to be the proper party or parties to receive the property for shipment or to accept it for delivery.

    However, this coverage shall not apply to any fraud or deceit by an employee of the Insured, whether acting alone or in collusion with others.

This coverage does not apply to:

    **(1)**    Export shipments, which have been laden on board export conveyance or have come under the protection of marine insurance, whichever first occurs;

    **(2)**    Import shipments until fully discharged from import conveyance or until marine insurance has ceased to cover, whichever last occurs;

    **(3)**    Shipments while waterborne except while on ferries or barges on inland waterways within territorial limits of the policy;

    **(4)**    Property of others, including the Insured's legal liability therefore, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

    **(5)**    Household goods of employees.

Coverage is subject to Transit the sublimits shown in Section **I.4.**

**35.**    **TREES, SHRUBS, PLANTS AND LAND IMPROVEMENTS**

This policy is extended to cover physical loss or damage to trees, shrubs, plants (other than trees, shrubs or plants grown or held for sale) and _**land improvements**_ at covered _**Locations**_ caused by peril(s) insured against herein. The most the Company will pay under this coverage, per _**occurrence**_ or per item, is the sublimit specified in Section **I.4.** of this policy.

**36.**    **UNINTENTIONAL ERRORS AND OMISSIONS**

This insurance shall not be prejudiced by any unintentional or inadvertent error, omission, incorrect valuation or incorrect description of the interest, risk or property, provided notice is given to the Company as soon as practicable upon discovery of any such error, omission, incorrect valuation or incorrect description. The most the Company will pay under this coverage is the sublimit specified in Section **I.4.** of this policy.

**37.**    **UNSCHEDULED _LOCATIONS_**

This policy is extended to cover property at unscheduled _**Locations**_ which are _**Locations**_ owned, leased, operated or regularly used by the Insured that do not appear on any Schedule of _**Locations**_ and values on file



**CNA Property Policy**

**Signature Policy Form**

with the Company. The most the Company will pay for loss or damage at any one of these **Locations** is the sublimit specified in Section **I.4.** of this policy.

If this policy includes **Time Element** coverage, any **Time Element** loss resulting from covered physical loss or damage at an unscheduled **Location** shall also be included in the Unscheduled **Locations** sublimit in Section **I.4.** of this policy.

This coverage excludes loss or damage directly or indirectly caused by or resulting from **Earth Movement** or **Flood**.

38. **VALUABLE PAPERS & RECORDS**

This policy also covers the costs of research and other expenses to replace or restore the information on valuable papers and records for which there are no duplicates. It also covers the amount in excess, if any, of valuation provision **IV.12**. All coverage is subject to the sublimit specified in Section **I.4.** of this policy.

For the purposes of the coverage provided herein, valuable papers and records means: written, printed, or otherwise inscribed documents and records, including books, manuscripts, maps, drawings, film, and other photographically produced records such as slides and microfilms, legal and financial agreements such as deeds, mortgages and leases, but does not mean **Money** or **Securities** nor does it mean **Media**, **Data**, **Application Software**, **System Software** or **Source Code**.

---

**D.     EXCLUSIONS**

---

1. **Group 1. Exclusions**

**Unless otherwise provided for and limited in Section I.4., this Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of (a) the cause of the excluded event; or (b) other causes of the loss; or (c) any other causes or events, whether or not insured under this Policy, which may have contributed concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurred suddenly or gradually, involved isolated or widespread damage, arose from natural or external forces, or occurred as a result of any combination of any of the following:**

a.     Nuclear Hazard

Nuclear reaction or nuclear radiation, or radioactive contamination from any cause, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by the peril(s) insured against in this policy. However, ensuing loss from fire will be covered.

This exclusion does not apply to physical loss or damage caused by sudden and accidental radioactive contamination, including resultant radiation damage, from materials used or stored or from processes conducted on the insured premises, provided that, at the time of such loss or damage, there is neither a nuclear reactor nor any new or used nuclear fuel on the insured premises.

b.     War and Military Action

War, invasion, act of foreign enemy, hostilities or warlike operations (whether war be declared or not), civil war;

Mutiny, civil commotion assuming the proportions of or amounting to a popular uprising, military uprising, insurrection, rebellion, revolution, military or usurped power, martial law or state of siege or any of the events or causes which determine the proclamation or maintenance of martial law or state of siege;

Seizure or destruction under quarantine or customs regulation, commandeering, confiscation, expropriation, nationalization, or destruction by order of any government (de jure or de facto) or public authority, except destruction by order of public authority to prevent spread of fire or explosion.

Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

c.   Terrorism

For the purposes of this policy, Terrorism shall mean the use or threat of force or violence against persons or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in connection with any organization, government, power, authority or military force, when one or more of the following apply:

The effect is to intimidate or coerce a government or business, or to disrupt any segment of the economy;

The effect is to cause any alarm, fright, fear or danger, or apprehension of public safety; or

The apparent or logically implied intent is to further political, ideological, religious or cultural objectives, or to express support for (or opposition to) a philosophy, ideology, religion or culture.

d.   _**Earth Movement**_,

unless otherwise endorsed hereon or limited in Section **I.4.** of this policy. However, ensuing loss by fire, explosion or leakage from fire protective systems or devices will be covered.

e.   _**Flood**_,

unless otherwise endorsed hereon or limited in Section **I.4.** of this policy. However, ensuing loss by fire or explosion will be covered.

f.   _**Computer Virus**_

g.   _**Contaminants or Pollutants**_

The release, discharge, or dispersal of toxic or hazardous substances, _**Contaminants or Pollutants**_, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical loss or damage covered by this policy; unless the contamination is itself caused by covered physical loss or damage of property insured by this Policy for the following Causes of Loss:

> Fire; lightning; explosion; wind or hail; smoke; direct impact of vehicle, aircraft or vessel; strike, riot or civil commotion; vandalism or malicious mischief; Equipment Breakdown; leakage or accidental discharge of fire protection equipment; collapse; falling objects; weight of snow, ice or sleet; theft; sudden and accidental discharge, leakage, backup, or overflow of liquids or molten material from confinement within piping, plumbing systems, tanks, equipment or other containment located at the insured _**location**_;

This policy does not insure against any loss, damages, costs or expenses incurred as the result of any government or regulatory directive or request that the Insured or anyone acting under the Insured's direction or control test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any toxic hazardous substances, _**Contaminants or Pollutants**_.

h.   _**Fungi**_, Wet Rot, Dry Rot and _**Microbes**_,

(1)   The presence, growth, proliferation, spread or any activity of _**Fungi**_, wet rot, dry rot or _**Microbes**_, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this policy;

(2)   Any government or regulatory directive or request that the Insured or anyone acting under the Insured's direction or control test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any _**Fungi**_, wet rot, dry rot or _**Microbes**_.

i.   Unexplained loss, mysterious disappearance, or loss or shortage disclosed upon taking inventory;

j.   Any willful or dishonest act or omission of the Insured or any associate, proprietor, partner, director, trustee, elected officer or employee, or agent of the Insured except a bailee or common carrier. This exclusion applies to _**Theft**_ by the Insured's employees, but not to acts of destruction by such employees;

Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

k.  Losses which are eligible for coverage under any government or national program or scheme to the extent of recoverability there under (conditions of payment and or delays in payment shall not abrogate this exclusion). This policy shall apply as excess of any amounts recoverable under such programs or schemes subject to the terms, conditions and limitations of this policy.

l.  Loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with the actual or threatened malicious use of pathogenic or poisonous biological or chemical materials regardless of any other cause or event contributing concurrently or in any other sequence thereto.

m.  Costs, expenses, fines or penalties incurred or sustained by or imposed on the Insured at the order of any government agency, court or other authority arising from any cause whatsoever.

**In any action, suit or other proceeding where the Company alleges that by reason of the above provisions any loss or damage is not covered by this insurance, the burden of proving that such loss or damage is covered shall be upon the Insured.**

2.  **Group 2. Exclusions**

**Unless otherwise provided for and limited in Section I.4., this policy does not insure against physical loss or damage caused by or resulting from the following; however, if physical loss or damage from a peril(s) insured against herein ensues, then this policy shall cover only for such ensuing loss or damage:**

a.  Errors or defects in design, construction or specification, errors in processing or manufacture, faulty workmanship or faulty materials;

b.  Electrical injury or disturbance to electrical appliances, devices or wiring caused by electrical currents artificially generated;

c.  Mechanical or machinery breakdown;

d.  Explosion, rupture, or bursting of fired or unfired pressure vessels or pipes, steam boilers, steam pipes, steam turbines, steam engines or flywheels owned or operated by the Insured;

e.  Damage sustained to goods while they are actually being processed, manufactured, tested or otherwise worked on;

f.  Enforcement of any ordinance or law regulating the construction, repair, use or demolition of any property insured hereunder, or which necessitates demolition of undamaged portions of property covered herein;

g.  Settling, bulging, cracking, shrinking or expansion of foundations, walls, roofs, ceilings, floors, walkways, patios, roadways and other paved surfaces;

h.  Delay, loss of market, loss of use or any other consequential or remote loss, unless coverage is provided by this policy, and then such loss is covered only to the extent provided herein;

i.  Gradual deterioration; depletion; inherent vice; insects, birds, rodents, or other animals, including nesting or infestation, or discharge or release of waste products or secretions; ordinary wear and tear; latent defect; decay, smog, shrinkage, evaporation, condensation, contamination, corrosion, erosion, rust, marring or scratching; loss of weight, change in flavor, color, texture or finish unless such loss or damage is caused directly by physical damage not otherwise excluded;

j.  Dampness or dryness of atmosphere, extremes of temperature, changes of temperature or humidity, all whether atmospheric or not;

k.  Product Contamination and Recall

Loss or damage caused by or resulting from adulteration or contamination to raw stock, stock in process or finished stock or products in the stream of commerce which causes the stock or products to become diminished in value or use, including but not limited to diminished value or use due to change in color,

Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

finish, flavor, size or texture. This exclusion applies unless the adulteration or contamination is itself caused by covered physical loss or damage of property insured by this policy for the following causes of loss:

> Fire; lightning; explosion; wind or hail; smoke; direct impact of vehicle, aircraft or vessel; strike, riot or civil commotion; vandalism or malicious mischief; Equipment Breakdown; leakage or accidental discharge of fire protection equipment; collapse; falling objects; weight of snow, ice or sleet; theft; sudden and accidental discharge, leakage, backup, or overflow of liquids or molten material from confinement within piping, plumbing systems, tanks, equipment or other containment located at the insured *Location*;

Further, this policy does not insure against any loss, damages, costs or expenses incurred by the Insured or by others for loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of the Insured's products or the Insured's direct or indirect customers or suppliers if such product or any portion of it is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy, contamination or dangerous condition.

l.   Loss or damage to the interior portion of buildings under construction or renovation from rain, sleet or snow, whether or not driven by wind, when the installation of the roof, walls and windows of such buildings has not been completed.

**3.**   *Time Element* **Exclusions**

In addition to the Group 1. and Group 2. exclusions, the following exclusions apply to *Time Element* coverages;

**a.**   Any loss during a period during which business would not or could not have been conducted for any reason other than physical damage of the type insured against herein;

**b.**   Any increase in loss due to interference at the insured *Locations* by strikers or other persons charged with rebuilding, repairing or replacing the property, or with the resumption or continuation of business;

**c.**   Any increase in loss due to the suspension, lapse or cancellation of any lease, license, contract or order, except as provided by Section **II.C.14. EXTENDED PERIOD OF INDEMNITY**;

**d.**   Any loss resulting from damage to, expense associated with, or cost to remanufacture or recall any *Finished Stock*;

**e.**   *Time Element* loss arising from property in transit away from *Locations* insured by this policy.

---

| **III.** | **GENERAL CONDITIONS** |
|---|---|

**1.**   **ABANDONMENT**

There can be no abandonment to the Company of any property.

**2.**   **ACCESS TO BOOKS AND RECORDS**

It is agreed that the Company, or its authorized representatives, shall at all reasonable times, have access to and the right to review the books and records of the Insured for the purposes of conducting an audit or determining any facts relating to this insurance or a claim. With regard to any such review or access, the Insured shall provide, at the Insured's expense, adequate private working area and facilities and staff, adequate copying and telephone facilities.

**3.**   **ASSIGNMENT OF THE POLICY**

This policy may be assigned or transferred only with the prior written consent of the Company.

**4.**   **CANCELLATION**

This policy may be canceled at any time at the request of the Insured by mailing or delivering advance written notice of cancellation to the Company. If canceled at the Insured's request, the Company shall retain or collect

G300709A (10-08)                  Copyright CNA All Rights Reserved.



the customary short rates for the time the policy has been in force. This policy may be canceled by the Company by mailing to the Insured written notice stating that not less than sixty (60) days after the mailing date such cancellation shall be effective. Upon cancellation by the Company, the Company shall return any pro-rata unearned premium to the Insured. Notwithstanding the above, this policy may be canceled by the Company for non-payment of premium by giving ten (10) days written notice of such cancellation.

The mailing of notice as aforesaid shall be sufficient proof of notice and the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Insured or by the Company shall be equivalent to mailing.

**5.   CERTIFICATES OF INSURANCE**

Any certificate of insurance issued in conjunction with this policy shall be issued solely as a matter of convenience or information for the addressee(s) or holder(s) of said certificate of insurance, except where any Additional Insured(s) or Loss Payee(s) are named pursuant to the Special Provisions of said certificate of insurance. In the event any Additional Insured(s) or Loss Payee(s) are so named, this policy shall be deemed to have been endorsed accordingly, subject to all other terms, conditions, and exclusions stated herein.

The listed broker of record may only issue Certificates of Insurance evidencing coverage afforded by this policy.

**6.   CONCEALMENT, MISREPRESENTATION OR FRAUD**

This entire policy shall be void if, whether before or after a loss, the Insured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the Insured therein, or in any claim, or in the case of fraud, or false swearing by the Insured relating thereto.

**7.   CONFORMANCE WITH STATE STATUTES**

The terms of this policy which are in conflict with the applicable statutes of the state wherein this policy is issued are hereby amended to conform to such statutes, unless the statutes narrow or limit the coverage afforded by this policy and do not bar a policy from providing broader coverage.

**8.   CONTRIBUTING INSURANCE**

Permission is granted for the Insured to have other policies written upon the same plan, conditions and provisions as those contained in this policy. This policy will contribute to the total of each loss otherwise payable herein that percent resulting from the ratio that the limit of liability of this policy bears to the total limit of liability as provided by all policies written upon the same plan, conditions and provisions as these contained in this policy.

**9.   CURRENCY**

Unless otherwise specified, all amounts expressed herein are in the currency of the United States of America.

**10.   DIVISIBLE CONTRACT CLAUSE**

If this policy covers two (2) or more freestanding buildings, the breach of any condition of the policy in any one (1) or more of the buildings covered or containing covered property shall not prejudice the right to recover for loss occurring in any building covered or containing covered property, where, at the time of loss, a breach of condition does not exist.

**11.   ECONOMIC AND TRADE SANCTIONS**

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy is void **ab initio** (void from its inception) with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

**a.**   Any insured, or any person or entity claiming the benefits of an insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to U.S. economic or trade sanctions;

**b.**   Any claim or "suit" that is brought in a Sanctioned Country or by a Sanctioned Country Government, where any action in connection with such claim or suit is prohibited by U.S. economic or trade sanctions;

 Copyright CNA All Rights Reserved.



**CNA Property Policy**

**Signature Policy Form**

c.  Any claim or "suit" that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to U.S. economic or trade sanctions;

d.  Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country Government, where any activities related to such property are prohibited by U.S. economic or trade sanctions; or

e.  Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity that is otherwise subject to U.S. economic or trade sanctions.

As used in this policy a Specially Designated National or Blocked Person is any person or entity that is on the list of Specially Designated Nationals and Blocked Persons issued by the U.S. Treasury Department's Office of Foreign Asset Control (O.F.A.C.) as it may be from time to time amended.

As used in this policy a Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States of America.

**12.  EXCESS INSURANCE**

Permission is granted the Insured to have excess insurance over the limit of liability set forth in this policy without prejudice to this policy and the existence of such insurance, if any, shall not reduce any liability under this policy.

**13.  INSPECTIONS**

The Company, at all reasonable times during the policy period, shall be permitted but not obligated to inspect the property insured. Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute any undertaking, on behalf of or for the benefit of the Named Insured or others, to determine or warrant that such property is safe or healthful.

**14.  IMPAIRMENT OF RECOVERY RIGHTS FOR PROPERTY IN TRANSIT**

Any act or agreement by the Insured before or after loss or damage to property in transit whereby any right of the Insured to recover in whole or in part for loss or damage to property covered hereunder against any carrier, bailee or other party liable therefore, is released, impaired or lost, shall render this policy null and void, but the Company's right to retain or recover the premium shall not be affected.

The Company is not liable for any loss or damage which, without its written consent, has been settled or compromised by the Insured. It shall, however, be permissible for the Insured without prejudice to this insurance, to accept the ordinary bill of lading or shipment receipts issued by carriers limiting their liability to less than the actual value.

**15.  LOSS PAYABLE CLAUSE**

Loss, if any, shall be adjusted with and payable to the Named Insured or their order, whose receipt shall constitute a release in full of all liability under this policy with respect to such loss.

**16.  MORTGAGEE INTERESTS AND OBLIGATIONS**

The following provisions in favor of any Mortgagee named in a schedule or Certificate of Insurance on file with the Company apply to the _**Location**_ for which the Mortgagee is named, unless another Mortgagee Clause is specifically indicated as applying.

a.  The term "Mortgagee" includes Trustees.

b.  For insured loss under this policy to specified property the Company will pay to each specified Mortgagee, as its interest may appear under all present or future mortgages upon the property, in order of precedence of the mortgages.

c.  The interest of the Mortgagee in property insured under this policy will not be invalidated by:

(1)  Any act or neglect of the Mortgagor or owner of the specified property;

(2)  Foreclosures, notice of sale, or similar proceeding with respect to the specified property;

Copyright CNA All Rights Reserved.